RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0215P (6th Cir.)
File Name: 01a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TINAJO MAY MCGRAW,
    *Petitioner-Appellant,*

    *v.*

JOY HOLLAND,
    *Respondent-Appellee.*

No. 99-2327

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 97-76212—Bernard A. Friedman, District Judge.

Argued: March 15, 2001

Decided and Filed: July 10, 2001

Before: MERRITT, NELSON, and SUHRHEINRICH,
Circuit Judges.

---

**COUNSEL**

**ARGUED:** F. Martin Tieber, STATE APPELLATE DEFENDER OFFICE, Lansing, Michigan, for Appellant. Raina I. Korbakis, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** F. Martin Tieber, STATE APPELLATE DEFENDER OFFICE, Lansing, Michigan, for Appellant. Vincent J.

Leone, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

———————————

**OPINION**

———————————

DAVID A. NELSON, Circuit Judge.   This is an appeal from a judgment denying habeas corpus relief to a 16-year-old girl who was convicted by a Michigan jury on a charge arising out of her assistance in the perpetration of a gang rape.   The trial evidence included a confession given by the petitioner during a custodial interrogation conducted by a police detective in the presence of the petitioner's mother.   Before she incriminated herself, the petitioner repeatedly told the detective she did not want to talk about the rape.   Both the detective and the mother told the petitioner that she had to talk about it, which she ultimately did.

In concluding that the confession was admissible in evidence, the state trial court decided that the petitioner had not effectively invoked her constitutional right to remain silent.   A challenge to that decision on direct appeal was unsuccessful.   The dispositive question in the habeas proceeding is whether the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   See 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act, 110 Stat. 1214 (1996).

The district court concluded that the decision reached by the Michigan court was a permissible one under the standard prescribed by the statute. We disagree. The judgment entered by the district court will be reversed, and the case will be remanded with instructions to grant the writ unless the petitioner is given a new trial.

I

A

On the night of February 5-6, 1993, the petitioner, Tinajo (Tina) May McGraw, was one of a group of eight or so people who were "partying" at a house in Saginaw, Michigan. (Although Tina was not yet 17 years old, she did not attend school and was already the mother of a young son; the boy was not with her on the night in question, although an unrelated child was in the room when the rape occurred.) During the early morning hours of Saturday, February 6, one of the party-goers (a 28-year-old woman who allegedly "kept talkin' about some crack" and with whom Tina had engaged in a fist fight earlier in the evening) was beaten and raped by several of the male guests. The police were called at about 6 a.m. When police officers arrived at the house, the victim told them that she had been held down during the rape by Tina and the latter's friend Carolyn Simons.

Tina was arrested at the scene and taken into custody. The police summoned Tina's mother to the police station, and a detective, Tamie Reinke, took Tina and her mother into an interview room at about 9:30 a.m. There Tina was advised of her Miranda rights, both orally and in writing, and she signed a written waiver form (as did the mother) evidencing her understanding of her right to remain silent and her right to an attorney.

Detective Reinke began a formal interrogation at approximately 9:40 a.m. The interview, which was tape recorded, ended at about 10:45 a.m.

A transcript of the tape discloses that Tina was reluctant to talk about the details of the rape. Acknowledging that "bad things that happen are always hard to talk about," the detective told Tina that "you need to tell me what was happening at the house." Tina then asked if the interview could be postponed: "Can we just talk about this later," she asked. Tina's mother and the detective both replied in the negative, the detective explaining that "we need to talk about

it now because *** I need to investigate it to decide what's gonna happen with people."

Tina initially denied having restrained the victim during the rape. "I didn't touch the girl," she repeatedly declared; "I tried to help her." The detective eventually said that she did not think Tina was being honest about what had happened, perhaps because she was afraid of what Carolyn and the other participants would do to her if she told the truth.

After a short break, the detective renewed her request for an honest account of what had transpired. Tina mumbled something that was not fully audible, and then told the detective this: "I don't want to talk about it. I don't want to remember it . . . ." Just "do what you have to do with me," Tina continued, "I didn't want to talk about . . . ."

The detective acknowledged again that disclosure would be difficult, but asked if Tina wanted other people to get away with what they had done by blaming everything on her. Tina's mother likewise urged the girl to tell what had happened. Tina, however, made known her lack of enthusiasm for "me tryin' to walk the streets and gettin' shot and killed for tellin' . . . ." This theme recurred at several points in the ensuing discussion, as did assurances that the others would be locked up and that Tina could help herself by cooperating.

Still Tina resisted. "I can't think about it," she said. "I don't want," she continued, at which point the detective interrupted to take Tina's hand while her mother spoke of moving to another town where no one would think to look for her.

After a discussion of how Tina had been pistol whipped a month earlier and had exacted revenge with Carolyn's help, the detective steered the conversation back to the events of that morning: "How many guys did you see rape her," the detective asked. "How many of'em?"

not whether the court's decision involved an unreasonable application of the Constitution as written. The question before us, rather, is this: Did the trial court's decision involve an unreasonable application of clearly established federal law as determined in *Miranda* and its Supreme Court progeny? The answer to that question, as we have explained, is "yes."[3]

Accordingly, and because the state does not contend (and could not reasonably contend) that the harmless error rule has any role to play in this case, the judgment entered by the district court is **REVERSED**. The case is **REMANDED** with instructions to issue a writ of habeas corpus unless Tina is granted a new trial within a time to be fixed by the district court.

---

See *Dickerson*, 530 U.S. at 449 (Scalia, J., dissenting).

[3]Because *Dickerson* was not decided until several years after Tina's confession was used against her at trial, the state might conceivably have argued that at the time of trial the applicability of *Miranda* and its progeny to state court proceedings had not been "clearly" established by the United States Supreme Court. No such argument has been presented to us, however, perhaps because *Miranda* itself involved state court proceedings and because the Supreme Court, as the majority opinion in *Dickerson* notes (530 U.S. at 438), has "consistently applied *Miranda*'s rule to prosecutions arising in state courts." The issue not having been raised, in any event, we need not undertake to decide it.

which the detective had insisted (in response to Tina's saying "I don't wanna talk about it") that "[w]e have to talk about it. We have to get this cleared up. The hearing's at one-thirty." The timing of this explicit rejection of an unambiguous request to remain silent clearly refutes the state's proffered reason for the rejection.

We note, finally, that in denying the motion to suppress the confession, the state trial court took into account not only Tina's demeanor, as reflected in the tape recording, but Detective Reinke's demeanor and attitude toward Tina after the latter's statements about not wanting to talk. The magistrate judge, who also listened to the tape recording, found nothing to alter the conclusion to which a reading of the transcript would point. Neither do we.

It is true, to be sure, that the detective's attitude toward Tina was very sympathetic. The detective obviously believed that she could catch more flies with honey than with vinegar. Nothing resembling the rack and the thumbscrew was employed in this case. Tina's will does not seem to have been overborne, and – assuming that hers was not "a confession forced from the mind by the flattery of hope," see *King v. Parratt*, 4 Car. & P. 570, 172 Eng. Rep. 829 (N.P. 1831), as quoted in *Dickerson*, 530 U.S. at 433 – the confession appears to be trustworthy.

Perhaps the trial court's decision to admit the confession in evidence was not an unreasonable application of the Constitution as written.[2]  But the question before us here is

---

[2]What the Constitution itself excludes from trial, as Justice Scalia noted (530 U.S. at 445) in dissenting from the majority opinion in *Dickerson*, is "compelled confessions" – which Tina's confession, one could reasonably conclude, wasn't. Yet under the *Miranda* rule, as the *Dickerson* majority explained, "statements which may be by no means involuntary, made by a defendant who is aware of his 'rights,' may nonetheless be excluded and a guilty defendant go free as a result." 530 U.S. at 444. James Madison and his contemporaries would probably have found such a result perplexing, unless the Fifth Amendment was in fact aimed at "[p]reventing foolish (rather than compelled) confessions . . . ."

"I don't wanna talk about it," Tina replied. "We have to talk about it," the detective insisted. "We have to get this cleared up. The hearing's at one-thirty."

Tina then suggested that she would just go ahead and take all the blame. Detective Reinke would not accept that, asking "did you and Carolyn hold the girl's [sic] down because the guys told you to?" The mother repeated the question, and the detective said "Tina, I know you touched the girl . . . ."

Once again Tina responded with the words "I don't want to talk about it." Her mother told her she had to talk about it and could not take the rap for a "he[a]th[e]n" like Carolyn. "I don't wanna talk about it," Tina repeated. "I just don't wanna talk about it," she said for the eighth or ninth time.

Refusing to take no for an answer, the detective kept urging full disclosure. Tina was old enough to be tried as an adult, the detective told her, and was facing a life sentence in prison. "If I tell you what happened," Tina finally responded, "I'll go free, right?" The detective replied that she could promise nothing "right now," and went on to say that "you have to be honest with me first and then we can talk about what we're gonna do with you . . . ."

Succumbing at last, Tina then gave a detailed confession. She explained that she had held one of the victim's arms and Carolyn had held the other while "the guys" (apparently three in number) engaged in oral and vaginal sex with the victim and hit and kicked her. A child who was about eight years old watched all this. "He was just sittin' there laughin'," Tina said.

### B

It was decided that Tina should be tried as an adult. After an evidentiary hearing, the state trial court to which the case was assigned denied a motion *in limine* in which the defense had sought to have the confession suppressed. The trial court's key finding was this:

"I am absolutely convinced that when the defendant said 'I don't want to talk about it' she did not mean that she wanted to stop the interview. She never demanded or requested to terminate the interview."

Portions of the tape recording were played to the jury at trial, and the prosecutor highlighted the confession during closing argument. In the course of its deliberations the jury asked either to see a transcript of the confession or to hear the recording again. The judge allowed the tape to be replayed. Shortly thereafter the jury returned a verdict of guilty on one count of first-degree criminal sexual conduct. Tina was sentenced to imprisonment for a term of 20 to 30 years.

On appeal to the Michigan Court of Appeals, Tina's counsel maintained that the confession should have been suppressed both because it was "coerced by promises of leniency" and because it was "extracted in disregard of continued requests to stop the interview . . . ." The court of appeals affirmed the conviction, concluding that the confession had been given voluntarily. The court noted that Tina and her mother had "both signed a form waiving defendant's *Miranda* rights" and had told the detective that they knowingly waived these rights and wished to talk. The court did not advert to Tina's repeated declarations, during the first part of the interrogation, that she did not want to talk about the rape.

The Michigan Supreme Court denied an application for leave to appeal. Thereafter, in December of 1997, the present habeas proceeding was initiated in the federal district court. The case was referred to a magistrate judge, who issued a report and recommendation in which he concluded that a writ should issue. The district judge disagreed, finding Tina's statements that she did not want to talk about the rape "unclear and ambiguous." In context, the district court suggested, a reasonable police officer could have believed that Tina was merely indicating "a hesitancy due to a fear of retaliation from the other suspects."

circumstances, the reasonableness of Michigan's application of *Miranda* is to stand or fall on the reasoning of the trial court, it obviously falls.

The state trial court did not profess to find, as the federal district court did, that Tina was being unclear when she said that she did not want to talk about the rape. Neither did the state trial court conclude, as the district court seems to have done, that an invocation of the right to silence is unclear, and thus ineffective, if it stems from a fear of retaliation. But had the state court taken either tack, we believe that it would have been objectively unreasonable in doing so.

In connection with requests for counsel, the Supreme Court has told us that the request must be made "unambiguously." See *Davis v. United States*, 512 U.S. 456, 459 (1994). Tina's lawyer does not deny that an invocation of the right to silence, if it is to be effective, must be unambiguous as well. As far as we can see, however, there was nothing ambiguous about Tina's repeated insistence she did not want to talk about the rape. When Tina kept saying, without qualification, that she just did not want to talk about the subject – making these declarations after she had been formally advised of her right of silence – it would simply not be reasonable to take her words at less than face value. And if her reason for not wanting to talk about the rape was a fear that she would be shot and killed if she did, the existence of such a fear would not make it any less clear that she meant what she was saying. If anything, it would make it even more clear that she really did not want to talk about the rape. We are aware of no support, either in logic or in law, for the proposition that an otherwise unambiguous expression of a desire to remain silent can somehow become ambiguous if prompted by a fear of retaliation.

The state argues that when Detective Reinke rejected Tina's requests to remain silent on the subject of the rape, the detective was merely declining to let Tina take sole responsibility for the crime. But Tina's suggestion that "I'll just go ahead and take [all] the blame" came *after* the point at

If there was ever any doubt that *Miranda* gives a suspect the right to control the subjects discussed at a police interview, as well as the right to determine whether the interview will proceed at all, that doubt was removed, as we see it, by *Michigan v. Mosley.* "Through the exercise of his option to terminate questioning," the Supreme Court declared in that case, the suspect "can control the time at which questioning occurs, *the subjects discussed,* and the duration of the interrogation." *Mosley*, 423 U.S. at 103-04 (emphasis supplied).[1]

It is true that Tina did not say to the detective, in so many words, "I want to exercise my option to terminate this interview altogether if I will otherwise have to talk about the rape." But the Supreme Court has long held that "no ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." See *Emspak v. United States*, 349 U.S. 190, 194 (1955). Any reasonable police officer, knowing that exercise of the right to silence must be "scrupulously honored," would have understood that when Tina repeatedly said she did not want to talk about the rape, she should not have been told that she *had* to talk about it. For the state trial court to hold otherwise, we believe, was objectively unreasonable.

Unlike the state trial court, the Michigan Court of Appeals confined itself to the issue of whether the confession had been given voluntarily. The appellate court simply did not address the question whether the confession was inadmissible by reason of its having been given after Tina invoked her right of silence with respect to the rape. That being so, and the Michigan Supreme Court not having spoken to the question either, the rationale given by the trial court represents the state's final word on the subject. If, under these

---

[1] It will be recalled that Tina asked the detective near the outset whether the interview could be postponed. The significance of this question need not concern us here, given our conclusion that Tina effectively invoked her right to silence on the subject of the rape by saying that she did not want to talk about it.

In dismissing Tina's habeas case, the district court issued a certificate of appealability pursuant to 28 U.S.C. § 2253(c). The certificate was limited to the admissibility of the confession in light of the claim "that petitioner's statement . . . was extracted in disregard of continued requests to stop the interview and coerced by promises of leniency." Our panel has jurisdiction to decide both branches of this claim, a timely notice of appeal having been filed, but we find it unnecessary to reach the contention that the confession was "coerced by promises of leniency."

II

The Antiterrorism and Effective Death Penalty Act of 1996 provides, among other things, as follows:

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Tina McGraw claims that her confession was inadmissible under *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. This claim was adjudicated on the merits in the state court proceedings. Unless one of the statutory conditions was met, therefore, the district court acted correctly in denying the application for a writ of habeas corpus.

Tina does not contend that the state court's decision was based on an unreasonable determination of the facts. She

does contend, however, that the decision to admit the confession came within 28 U.S.C. § 2254(d)(1) as "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States . . . ."

We are persuaded that the state court applied clearly established elements of the *Miranda* rule to the facts of Tina's case "unreasonably." If we are correct in this, we are free to conclude, as we do, that the state court decision falls within 28 U.S.C. § 2254(d)(1) and that the general prohibition against granting habeas relief with respect to claims adjudicated on the merits by a state court has no application here. See *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (holding that "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case, a federal court applying § 2254(d)(1) may conclude that the state-court decision falls within that provision's 'unreasonable application' clause"). See also *Florida v. Thomas*, 121 S.Ct. 1905 (2001), and *Doan v. Brigano*, 237 F.3d 722, 729 (6th Cir. 2001).

In the *Miranda* decision itself, the Supreme Court explained its holding in the following terms: "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444. Among the procedural safeguards that the *Miranda* Court went on to enumerate was the following:

"[I]f the individual is alone [*i.e.* without an attorney] and indicates *in any manner* that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id*. at 445 (emphasis supplied).

The *Miranda* Court made it crystal clear that giving the prescribed warnings before the commencement of questioning does not preclude invocation of the right to silence during questioning:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, *at any time prior to or during questioning*, that he wishes to remain silent, the interrogation must cease." *Id*. at 473-74 (emphasis supplied).

As the Supreme Court subsequently explained in *Michigan v. Mosley*, 423 U.S. 96, 103 (1975), "[a] reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right to silence and to assure that the exercise of the right will be *scrupulously honored* . . . .'" (Quoting *Miranda*, 384 U.S. at 479.) (Emphasis supplied.)

The Supreme Court has recently declined to overrule the *Miranda* decision. See *Dickerson v. United States*, 530 U.S. 428, 432 (2000). Characterizing *Miranda* as a "*constitutional* decision," moreover, the Court held in *Dickerson* that *Miranda* and its Supreme Court progeny "govern the admissibility of statements made during custodial interrogation *in both state and federal courts*." *Id*. (emphasis supplied).

In the criminal proceeding against Tina McGraw, the state trial court declined to hold the confession inadmissible under *Miranda* since Tina "never demanded or requested to terminate the interview." Although Tina said that she did not want to talk about the rape itself, in other words, her confession that she assisted in the rape was held to be admissible under *Miranda* because she never said that she did not want to talk about subjects other than the rape. This, in our view, was an unreasonable application of *Miranda* and its progeny.