**Walter CRAWLEY, III, Petitioner,**

v.

**Bruce CURTIS, Respondent.**

No. 00–CV–71474–DT.

United States District Court,
E.D. Michigan,
Southern Division.

July 19, 2001.

Walter Crawley, Kincheloe, MI, pro se.

Brenda E. Turner, Michigan Department of Attorney General, Lansing, MI, Vincent J. Leone, Michigan Department of Attorney General, Lansing, MI, for Bruce Curtis.

## MEMORANDUM OPINION AND ORDER

TARNOW, District Judge.

### I. Introduction

Currently pending before the Court is the *pro se* habeas corpus petition of Walter Crawley, III ("Petitioner"). Following a bench trial in 1993, Petitioner was convicted of first-degree premeditated murder, MICH. COMP. LAWS § 750.316, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. The convictions arose from the fatal shooting of Julius Lewis in Detroit, Michigan on November 15, 1991. The evidence produced at trial

> established that [Petitioner] was angry about losing $3,000 in a drug deal set up by [Lewis], and that [Petitioner] left Columbus, Ohio, with a loaded gun, in a car unknown to [Lewis], to confront [Lewis]. [Petitioner] bragged to his girlfriend that he 'had something to take care of' and that she would 'hear about it the next day.' [Petitioner] tracked down [Lewis] and blocked his means of escape. He took the loaded weapon from his car and approached [Lewis's] car. [Petitioner] fired the weapon five times, though only one bullet hit [Lewis]. [Petitioner] fled the scene at high speed with the car's lights off. [Petitioner] later gave what proved to be a false statement to the police in order to avoid prosecution.

*People v. Crawley,* No. 163247, at 1 (Mich. Ct.App. June 14, 1996). The trial court sentenced Petitioner to two years in prison for the felony firearm conviction and to a consecutive term of life in prison for the murder conviction.

Petitioner appealed his conviction to the Michigan Court of Appeals, which remanded the case for an evidentiary hearing on

Petitioner's claim that defense counsel should have moved to suppress his statements to the police. The court of appeals affirmed Petitioner's conviction in all other respects and did not retain jurisdiction. *See id.* at 1–2.

On remand, the trial court conducted an evidentiary hearing. The trial court determined at the close of the hearing that Petitioner's right to remain silent was violated during custodial interrogation by the police. The trial court nevertheless concluded that defense counsel was not ineffective for failing to file a motion to suppress Petitioner's statements. Petitioner appealed the trial court's decision, but both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal. *See People v. Crawley*, No. 206462 (Mich.Ct.App. Feb. 24, 1998); *People v. Crawley*, 459 Mich. 955, 595 N.W.2d 849 (1999).[1]

On April 4, 2000, Petitioner filed the pending habeas corpus petition, alleging four grounds for relief:

I. The trial court's decision that trial counsel's failure to move for the suppression of Petitioner's statement obtained in violation of *Miranda* did not constitute ineffective assistance of counsel because the admission of the statement was harmless error involved an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

II. The Michigan Court of Appeals decision that Petitioner was not denied his Sixth Amendment right to the effective assistance of counsel which denied Petitioner his right to a fair trial is contrary to clearly established federal law as determined by the Supreme Court of the United States and/or involved an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

III. The Michigan Court of Appeals failure to reach the merits of Petitioner's claim that he was denied his Fourteenth Amendment right to a fair trial because of improper prosecutorial remarks is contrary to clearly established federal law as determined by the Supreme Court of the United States and/or involved an unreasonable determination of facts in light of the evidence presented in the state court proceedings.

IV. The Michigan Court of Appeals decision that the evidence was sufficient to justify the trial court's finding of premeditation and deliberation was contrary to clearly established federal law as determined by the Supreme Court of the United States and/or involved an unreasonable determination of facts in light of the evidence presented in the state court proceedings.

The Court may grant the writ of habeas corpus only if the state court's adjudication of Petitioner's claims on the merits—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the

---

1. Justice Clifford W. Taylor did not participate in the decision, and Justices Michael F. Cavanagh, James H. Brickley, and Marilyn Kelly voted to remand the case to the court of appeals for consideration as on leave granted.

facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor,* 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). For the following reasons, the Court agrees with Respondent, who argues in an answer to the habeas petition that the state court's decision was not contrary to, or an unreasonable application of, Supreme Court precedent.

## II. *Discussion*

### A. *Defense Counsel's Failure to Move to Suppress Petitioner's Statements*

Petitioner alleges that his statements to the police were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that his attorney's failure to move to suppress the statements constituted ineffective assistance of counsel. Petitioner contends that the trial court's determination that defense counsel's error did not prejudice him involved an unreasonable determination of the facts.

### 1. *The Right to Remain Silent*

The Fifth Amendment states that "[n]o person shall be ... compelled in any criminal case to be a witness against himself...." U.S. CONST. amend. V.[2] To protect this right, an individual who

is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning ... must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona,* 384 U.S. at 478–79, 86 S.Ct. 1602.[3]

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. 1602. "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

■ The question here is whether defense counsel was ineffective for failing to move to suppress Petitioner's statements to the police on the grounds that the statements were taken in violation of *Miranda* and Petitioner's right to remain silent. "[F]ailure to file a suppression motion does not constitute *per se* ineffective assistance of counsel....." *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). To prevail on his claim, Petitioner must demonstrate that defense counsel's performance was defi-

---

**2.** The Fifth Amendment is applicable to the states through the Fourteenth Amendment. *Griffin v. California,* 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

**3.** The Supreme Court recently declined to overrule *Miranda. See Dickerson v. United*

*States,* 530 U.S. 428, 432, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). *"Miranda* and its progeny in [the Supreme] Court govern the admissibility of statements made during custodial interrogation in both state and federal courts." *Id.*

cient and that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■■■ The proper standard for attorney performance is "reasonably effective assistance." *Id.* Petitioner must demonstrate that his attorney's "representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. A court need not determine whether counsel's performance was deficient, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. *Id.* at 697, 104 S.Ct. 2052.

The prejudice prong requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

### 2. *Petitioner's statements*

The record before the Court indicates that Police Officer Reginald Harvel advised Petitioner of his constitutional rights at 5:00 p.m. on November 19, 1991. Petitioner subsequently told Harvel that Julius Lewis arranged for him to buy cocaine from two unknown men. After the deal was consummated, Petitioner returned home to Columbus, Ohio and discovered that the substance he purchased for $2,900 was not cocaine. He later told Julius that he wanted his money returned. Julius said that the seller would return Petitioner's money or provide another package of cocaine. On November 15, 1991, Petitioner drove to Detroit where he saw Lanal [Black]. Then he went to Domino's.

"Randy" was with him. They saw Julius leave Domino's and then followed him.

At this point in the interrogation, Petitioner said that he did not want to continue talking, because he might incriminate himself and because he wanted to speak with his father. Consequently, the conversation ended although Harvel did ask Petitioner for consent to search Petitioner's apartment and his father's residence for the murder weapon. Petitioner responded that he did not know where the murder weapon was, but he did know that it was not at his place or his father's residence. *See* T I at 152–61 [4]; *see also* Constitutional Rights Certificate of Notification and Notes from Walter Crowley (11/19/91).

Detective Dale Collins asked Petitioner after supper, if he wanted to speak with him. Petitioner said that he would talk with him. Collins interrogated Petitioner at 8:15 p.m. on November 19, 1991. Petitioner informed Collins that he had a gun at the laundromat and that he showed it to Lanal Black, the mother of his child. He told Lanal that he was going to take care of some business. Later, he and Randy waited for Julius to come out of the pizza place where he worked. They followed Julius to the place where he delivered the pizza. Petitioner then blocked the intersection. After Julius got in his car, Petitioner got out of his car and walked up to Julius's car. Then Randy walked up and shot Julius several times. He and Randy ran back to Petitioner's car. They drove off and eventually returned to Columbus. *See* T II at 4–8; *see also* Walter Crawley's Witness Statement (Nov. 19, 1991). Detective Collins testified at the evidentiary hearing that he interrogated Petitioner without first reading the *Miranda* rights to him and despite the fact that he knew

---

4. "T" refers to the two-volume transcript of trial: T I (January 12, 1993); and T II (January 13–14, 1993).

Petitioner had expressed a desire to stop speaking to Harvel. *See* GH at 44–45.[5]

### 3. *The State Court Proceedings*

Defense counsel testified at the evidentiary hearing that he was sure he had considered filing a motion to suppress the statement. However, he thought that Petitioner's statement was probably the best testimony he would get at trial, because it pointed the finger at someone else. If he did not file a motion to suppress, the reason was that he did not think it would be granted. He thought that Petitioner had said the statement about someone else being the shooter was truthful. His initial plan was to have their defense contained in the statements. By the time, Petitioner took the stand and said that he was the shooter, he (defense counsel) was aware of problems with the originally-planned defense. *See id.* at 30–40. The trial court determined at the close of the hearing that, although Petitioner's right to remain silent was violated, defense counsel was not ineffective and his failure to suppress Petitioner's statement did not prejudice Petitioner. *See id.* at 78–80.[6]

■ Collins should have honored Petitioner's desire to remain silent. At a minimum, Collins should have advised Petitioner of his constitutional rights before interrogating him. Defense counsel should have been alerted to the possibility that a *Miranda* error occurred and that Petitioner's right to remain silent might have been violated.

The outcome of the case, however, likely would not have been different had defense counsel successfully suppressed Petitioner's statements. Lanal Black testified that Petitioner and Randy Monroe unexpectedly came to see her at the laundromat on November 15, 1991, at 9:45 p.m. Petitioner said that he had "something to take care of." When she asked what business it was, Petitioner responded that she would hear about it the next day. Then he showed her a gun, which he pulled out of his pocket. When Petitioner and Randy Monroe left the laundromat, Petitioner said that he was going to Domino's. On the following day, she (Lanal) learned that Julius Lewis had been killed. She called Petitioner and asked if he or Randy Monroe had killed Julius. Petitioner answered, "No." *See* T I at 98–105, 114–15.

Scharlene Black testified similarly. She claimed that, when she mentioned the drug deal in which Petitioner was cheated out of $2,900, Petitioner responded that he was "about to take care of that right now." Then he showed her the gun. When she asked why Petitioner was going to Domino's, Petitioner put his hand in his pocket and showed the impression of a gun. *See id.* at 133, 140.

Francine Stitt, who was Julius Lewis' girlfriend, testified that, before the shooting, Julius received a number of telephone calls from Petitioner. She had heard Julius tell the caller that he was trying to get the money. Julius told Stitt that he was afraid of what Petitioner might do, because

---

5. "GH" refers to the one-volume transcript of the *Ginther* (evidentiary) hearing. "In Michigan, a hearing on ineffective assistance claims is held pursuant to *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (Mich.1973)." *Washington v. Hofbauer*, 228 F.3d 689, 697 n. 3 (6th Cir.2000).

6. *Cf. McGraw v. Holland*, 257 F.3d 513, ——, 2001 WL 765477 at *1 (6th Cir. July 10,

2001), in which the trial court's key finding was that the defendant did not effectively invoke her right to remain silent. The Sixth Circuit concluded that the trial court's decision involved an unreasonable application of clearly established federal law as determined in *Miranda* and its Supreme Court progeny. *See id.* 2001 WL 765477 at *7, ——.

Julius had been unable to get Petitioner's money from the seller of the drugs. *See id.* at 141–48.

Randy Monroe testified that, on November 15, 1991, he and Petitioner drove to Detroit to make a deal. Petitioner began driving once they arrived in Detroit. They went to a laundromat and then to Domino's pizza shop. Petitioner said that he wanted to scare a guy about some money. They were looking for a car. When they saw the car stop, Petitioner got out and walked over to it, armed with a .45 caliber, semiautomatic handgun. Petitioner said to the occupant, "I want my money." Then he heard about three gunshots. Petitioner came back to the car and said that he could not believe what happened and that he had shot the man in the leg. *See* T II at 11–19.

Petitioner testified that he came to Detroit on November 15, 1991, to talk about the drug transaction that went bad and to get his money. He and Randy Monroe drank a gallon of cognac on the way to Detroit. He did not plan to shoot Julius Lewis; he merely intended to have Julius take him to the men who could refund his money or give him more drugs. The gun was intended to scare Julius. He pulled out the gun when Julius turned and bent down. He thought that Julius was reaching for a gun although he did not see a gun. He unintentionally pulled the trigger when Julius shifted gears, causing him (Petitioner) to lose his balance as he stood beside the open car door. *See id.* at 41–56.

#### 4. *Summary*

■ There was substantial evidence from prosecution witnesses that Petitioner was upset with Julius Lewis, that he pursued Julius, blocked his path, and then approached him with a loaded gun, demanded his money, and shot him several times at close range. Petitioner's testimony suggested that the shooting was accidental or done in self defense.

The trial court, who sat as finder of fact, found Petitioner's testimony incredible, in part, because Petitioner admitted on cross-examination that he had lied to the police to avoid getting in trouble. *See* T I at 54, T II at 106–07. However, the trial court also relied on Petitioner's admission that he had lied to his girlfriend. *See* T II at 53–54, 106–07. Therefore, Petitioner's statements to the police were not the only basis for the trial court's finding that Petitioner's testimony was not credible. Moreover, the trial court stated at the evidentiary hearing that the evidence at trial was overwhelming and that the failure to suppress Petitioner's statement would not have changed the outcome of the case. *See* GH at 79–80.

To conclude, Petitioner has not demonstrated that defense counsel's performance was deficient and that the deficient performance prejudiced the defense. Therefore, the state court's determination of the facts was reasonable and its decision that defense counsel was not ineffective was a reasonable application of *Strickland*. Petitioner is not entitled to habeas relief on the basis of his first claim. 28 U.S.C. § 2254(d).

#### B. *Other Alleged Ineffective Assistance*

Petitioner's second claim is that defense counsel was ineffective for failing to present a diminished capacity defense based on intoxication and for failing to inform him of all prosecution witnesses. To prevail on his claim, Petitioner has the burden of showing that defense counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The Michigan Court of Appeals concluded

without discussion that these claims had no merit.

### 1. *Failure to Raise a Defense based on Intoxication*

Petitioner alleges that defense counsel was aware of his intoxication on the day of the shooting, but that he did not prepare a diminished capacity defense or file the requisite notice. Defense counsel did argue that Petitioner must have been extremely intoxicated and, therefore, more aggressive as a result of the intoxication. He did not argue that, due to intoxication, Petitioner was unable to form the intent to kill Julius Lewis. *See* T II at 97–98.

■ "[A] diminished capacity defense, such as voluntary intoxication, is only available where it is shown that a defendant's impairment rendered him unable to formulate the specific intent to commit a crime." *People v. Flaherty*, 165 Mich.App. 113, 123, 418 N.W.2d 695 (1987). The evidence in this case did not support a finding that Petitioner was impaired or that intoxication rendered him unable to formulate the intent to kill Julius Lewis.

Petitioner and Randy Monroe testified at trial that, on the day of the shooting, they consumed a gallon of brandy. The evidence established, however, that they had been able to drive from Columbus, Ohio to Detroit and that Petitioner was able to find his daughter's home, the laundromat where his girlfriend was located, the pizza shop where Julius Lewis worked, and Lewis himself. Following the shooting, they engaged in another drug deal. Then they left the area and drove back to Columbus. Neither man informed the police before trial that they had been drunk on the day of the shooting. *See* T I at 159–160; II at 7–8, 21–22, 30–34, 55–56.

There was not a substantial basis for asserting that, due to voluntary intoxication, Petitioner was unable to form the specific intent to murder. Therefore, defense counsel's performance was not ineffective for failing to raise a claim of diminished capacity, and the state court's conclusion that Petitioner's claim lacked merit was not contrary to, or an unreasonable application of, *Strickland.* 28 U.S.C. § 2254(d)(1).

### 2. *Failure to Inform Petitioner of Prosecution Witnesses*

■ Petitioner alleges that his attorney failed to inform him before trial that Randy Monroe would be testifying against him. Petitioner contends that, if he had known Monroe intended to testify for the prosecution, he would have accepted the prosecutor's offer to plead guilty to second-degree murder.

The record is silent on whether defense counsel actually failed to notify Petitioner before trial that Randy Monroe would be testifying. The record does indicate that Monroe was not listed as a witness on the State's initial witness list. At the conclusion of the first day of trial, the prosecutor announced that Randy Monroe was scheduled to arrive in Detroit on the following morning. Defense counsel then asked for an opportunity to speak with Monroe before he testified. The prosecutor responded that he was in the same position as defense counsel. He explained that he had not been able to speak with Monroe, because he did not have Monroe's telephone number until Monroe called him on the first day of trial. The trial court granted the parties' request for time to speak with Monroe before he testified. *See* T I at 166–67.

It appears from the record that neither defense counsel, nor the prosecutor, were certain that Monroe would testify. In any event, Petitioner presumably could have re-evaluated his decision not to plead

guilty once it was clear that Randy Monroe would be testifying. In fact, defense counsel was quite certain at the evidentiary hearing that he had approached the prosecutor during trial about a possible plea. Defense counsel also testified that he had discussed all aspects of the case with Petitioner. *See* GH at 32, 37.

█ The Court concludes that defense counsel's alleged failure to inform Petitioner in advance of trial that Randy Monroe would be testifying did not constitute ineffective assistance. Accordingly, the state court's conclusion that Petitioner's claim had no merit was not an unreasonable determination of the facts or an unreasonable application of *Strickland,* and Petitioner has no right to habeas relief. 28 U.S.C. § 2254(d).

## C. *Alleged Prosecutorial Misconduct*

Petitioner's third claim is that the prosecutor made impermissible comments in his closing arguments. The disputed comments suggest that Petitioner's trial testimony was untruthful, that certain minor prosecution witnesses did not steal money from Julius Lewis after the shooting, and that Petitioner might be perpetrating a fraud on the trial court.

█ The Michigan Court of Appeals declined to review Petitioner's claim on the merits, because he failed to object to the prosecutor's remarks at trial. Respondent has not raised Petitioner's state procedural default as a defense, and the Court is not required to raise the doctrine of procedural default *sua sponte. Trest v. Cain,* 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997). Accordingly, the Court must decide whether the prosecutor's conduct infected Petitioner's trial with such unfairness as to make the resulting conviction a denial of due process. *Byrd v. Collins,* 209 F.3d 486, 529 (6th Cir.2000)(quoting *Darden v. Wainwright,* 477 U.S. 168, 181, 106

S.Ct. 2464, 91 L.Ed.2d 144 (1986))(quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)), *cert. denied,* —— U.S. ——, 121 S.Ct. 786, 148 L.Ed.2d 682 (2001).

█ The prosecutor was entitled to make reasonable inferences from the evidence, *United States v. Carter,* 236 F.3d 777, 784 (6th Cir.2001), and to suggest that Petitioner's testimony was not credible, *Portuondo v. Agard,* 529 U.S. 61, 69, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). Even if the comments were improper, the errors were harmless in light of the overwhelming evidence against Petitioner. *See Maurino v. Johnson,* 210 F.3d 638, 647 (6th Cir.) (applying harmless error analysis to claims of prosecutorial misconduct), *cert. denied,* 531 U.S. 979, 121 S.Ct. 427, 148 L.Ed.2d 435 (2000). Therefore, the state court's decision was not contrary to, or an unreasonable application of, federal law, and Petitioner is not entitled to habeas corpus relief on his claim of prosecutorial misconduct. 28 U.S.C. § 2254(d).

## D. *Sufficiency of the Evidence*

Petitioner's fourth and final claim is that the evidence was insufficient to convict him of first-degree murder because there was no evidence of premeditation and deliberation. According to Petitioner, the evidence established that he met Julian Lewis to resolve the dispute over the prior drug deal. Petitioner contends that the prosecutor merely speculated that he planned the killing.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). After *Winship,* the critical

inquiry on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (internal citation and footnote omitted) (emphasis in original). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n. 16, 99 S.Ct. 2781.

First-degree premeditated murder in Michigan requires a finding that the defendant committed a homicide with premeditation and deliberation. *People v. Morrin,* 31 Mich.App. 301, 328, 187 N.W.2d 434 (1971). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* at 329, 187 N.W.2d 434.

The trial court's opinion on the issue of premeditation and deliberation reads as follows:

> [T]he facts and the circumstances in the case show that there had been some prior thought about shooting and even some discussions about [Petitioner] doing something real serious to the complainant. The witnesses who testified about being at the laundromat, [Petitioner's] former girlfriend and her sister, they were both at the laundromat, and they both testified pretty consistently, and they both said that prior to the

> incident that [Petitioner] was there and stated that he had to take care of some business and he was going down to Domino's or over to the Domino's. And at that point in time he showed his gun. And to Scharlene he first showed the impression of the gun and then pulled the gun out afterwards. And it was clear that at that time [Petitioner] had the intention to use the gun, and in the court's opinion to use it in a pretty fatal nature.

> The evidence and the testimony in general shows that there was a drug deal that had occurred. That [Petitioner] was sold some fake drugs, and that he was pretty angry about having been beat out of twenty-nine hundred dollars. And it's clear that [Petitioner] had made some phone calls up (sic) to try to talk to Mr. Lewis. And Mr. Lewis's girlfriend testified that she had heard [Petitioner] speak before, recognized his voice on the telephone, and in fact the fact (sic) that he was making repeated phone calls to Mr. Lewis. And it's clear that the phone calls were made for the purpose of trying to get the twenty-nine hundred dollars back that he had lost on the bad deal.

> There was a fair amount of police officer testimony in the case and fair amount of testimony from neighbors who lived in the area, and all of them really, once [Petitioner] testified, once Mr. Monroe testified, their testimony almost becomes superfluous. But they showed that in fact a pizza was delivered by Mr. Lewis to Miss Czarnecki. He was right in that area. All of them heard four or five shots fired. The police came on the scene, and in searching the vehicle didn't find a wallet. They didn't see any kind of weapon or any kind of ammunition or anything that

would suggest that the victim pulled any kind of weapon or anything.

And Maurice Black primarily talks about the drug deal. He, I believe, was present when it occurred. And to a certain extent corroborated the fact that Mr. Lewis was the only person who knew the other persons who were involved in selling the drugs and was really the only person that [Petitioner] could get to to (sic) try to get his money back.

And the court believes that based on the evidence and the testimony that [Petitioner] in this case did think about the killing beforehand. That he planned it. That he thought about it quite a bit. He was at the laundromat I think talking about basically what he was going to do when he told one of the Blacks that they would hear about it the next day what he was going to do. And it doesn't take any stretching of the imagination or any speculation or any guesswork to conclude or infer that he intended to kill Mr. Lewis if Mr. Lewis didn't have that twenty-nine hundred dollars to give him.

So the court does find that [Petitioner] did have the intent to kill, that his intent to kill was premeditated, that it was thought out beforehand and that the killing was deliberate, which means that [Petitioner] considered the pros and cons of his actions and substantially reflected on it beforehand, and with all of that did commit the murder in the case. And it was clear that this wasn't something that was the result of sudden impulse without thought or reflection. And the court feels that [Petitioner] deliberately planned it out and followed through on that plan. And it was a clear and very obvious motive in this case to do what he did. So the court finds that all the elements of first-degree premeditated murder have been

made out and would accordingly find [Petitioner] guilty of that charge.

T II at 108–11.

The Michigan Court of Appeals noted in its opinion that "[w]hether the intent was formed days before the killing or at the moment [Petitioner] took the loaded weapon out of his car to confront [Lewis], the facts demonstrate a sufficient span of time to plan and 'take a second look.'" *Crawley*, No. 163247, at 1. The court of appeals concluded that "there was sufficient evidence produced at trial to justify the trial court's finding of premeditation and deliberation." *Id.*

■■■ The evidence, as summarized, supports the state court's conclusion. Moreover, federal habeas courts must give deferential review to state court decisions on sufficiency-of-the-evidence claims. *Gomez v. Acevedo*, 106 F.3d 192, 193–94 (7th Cir.), *vacated on other grounds*, 522 U.S. 801, 118 S.Ct. 37, 139 L.Ed.2d 6 (1997). Because the state court's decision was a reasonable determination of the facts and a reasonable application of *Jackson*, Petitioner is not entitled to the writ of habeas corpus on the basis of his fourth claim. 28 U.S.C. § 2254(d).

### III.  *Conclusion*

For all the reasons given above, Petitioner's application for the writ of habeas corpus and his request for counsel are **DENIED**. Petitioner's motion to procure Michigan Court of Appeals file number 206464 is **GRANTED**.[7]

---

7.  The State recently filed the volume, and the    Court has reviewed it.