**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 14 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JUAN SALAZAR,

Defendant - Appellant.

No. 01-3046

(D.C. No. 00-CR-20067-01-CM)

(D. Kansas)

**ORDER AND JUDGMENT** *

Before **SEYMOUR** , **ALARCON** ,** and **ANDERSON** , Circuit Judges.

Juan Salazar entered a conditional guilty plea to one count of possessing

more than 50 grams of methamphetamine, with intent to distribute, in violation of

21 U.S.C. § 841(a). He reserved the right to appeal the district court's denial of

his motions to suppress the evidence of drugs found by police officers during a

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

**The Honorable Arthur L. Alarcon, Circuit Judge, U.S. Court of Appeals, Ninth Circuit, sitting by designation.

warrantless search of a 1994 Ford Explorer driven by Mr. Salazar, and statements he made to federal officers allegedly in violation of his Fifth Amendment right to remain silent. On appeal, Mr. Salazar challenges both his conviction and sentence, reasserting that the district court erred in denying his motion to suppress the evidence of drugs found during the warrantless vehicle search and incriminating statements he made to federal officers. We affirm.

## BACKGROUND

The salient facts are not in dispute. On May 3, 2000, Lenexa Police Officer Phil Cross checked on a 1994 Ford Explorer parked at a Motel 6 in Lenexa, Kansas, and found it to be registered to Dana Toll who had two outstanding warrants for her arrest. Ms. Toll's address was listed as 7260 Richland Avenue, Kansas City, Kansas. A review of the motel's registration cards disclosed a card listing the vehicle, the defendant, Juan Salazar, and a residence address which appeared to be the same as that of Dana Toll. The motel clerk informed the officer that Mr. Salazar was accompanied by a female, and that they had checked into room 137.

Officer Cross, then joined by Officer Kevin Cooper, went to room 137, and were admitted by Mr. Salazar. There was a female in the room who identified herself as Lisa Hayes. The officers, suspecting prostitution, asked and received

-2-

consent to look around the room. In that process Officer Cross found in the wastebasket a clear plastic bag containing a white powdery substance which the officer, based on his experience, immediately recognized as methamphetamine or cocaine residue. Both Mr. Salazar and Ms. Hayes denied any knowledge of or connection with the bag, whereupon the officers told them they would both be placed under arrest if they continued to deny ownership.

At that point Mr. Salazar was handcuffed, and Ms. Hayes went outside the room to speak with Officer Cooper. She told Officer Cooper there was a pound of methamphetamine belonging to Mr. Salazar in a black bag in the Ford Explorer, to which she pointed. She subsequently altered that estimate to a half-pound of methamphetamine.

Back in the motel room Officer Cooper informed Mr. Salazar of Ms. Hayes' statements, placed him formally under arrest, and read him his *Miranda* rights. Mr. Salazar indicated he understood his rights but did not answer when the officer asked whether or not he would speak with him; he also did not request a lawyer. Prior to this exchange Mr. Salazar refused to give Officer Cross consent to search the Ford Explorer. The officers did, however, obtain the keys to the vehicle, and Mr. Salazar was then taken from the motel by another officer.

Officer Cross then returned to the parking lot and ran his drug detection dog, Bojar, around the vehicle. The dog alerted at two places to the presence of drugs in the vehicle.

During the encounters described above, the officers, with Mr. Salazar's consent, answered a telephone call to the room by a female who asked for directions to the motel. The officers testified that they were concerned that Dana Toll would come and move the vehicle.

Based on the information they possessed, the officers proceeded to conduct a warrantless search of the vehicle. That search yielded 144.3 grams of methamphetamine and a .38 caliber handgun.

On May 4, 2000, the Lenexa Police Department officers, accompanied by officers from the Kansas City, Kansas, Police Department, and officers from the FBI and DEA, went to Dana Toll's house at 7260 Richland Avenue in Kansas City, Kansas. Toll confirmed that the defendant lived with her at that address, and she consented to a search. Trained canines alerted to the presence of drugs at two locations in the house and garage, including a safe located under the bed. Subsequently the officers obtained a search warrant to open the safe, which contained $5,000 in cash, but no drugs. Except for drug residue, including clear sandwich bags containing marijuana residue, the officers found no drugs at the

residence or at Mr. Salazar's place of business. There were electronic scales at the residence and another gun.

Following his arrest on May 3, 2000, on state narcotics charges, Mr. Salazar was transported to the Johnson County Kansas Jail. Subsequently, federal charges were filed against Mr. Salazar, and on May 5, 2000, federal officers Special Agent Stanley Jones of the DEA and Special Agent Michael Pettry of the FBI, took charge of Mr. Salazar and transported him to Topeka, Kansas, for a court appearance. Prior to the trip Agent Pettry inquired of the Lenexa officers whether Mr. Salazar had been advised of and had invoked his right to remain silent and was told that Mr. Salazar had been advised of his rights but had not asserted his right to remain silent. During the trip to Topeka, Officer Jones advised Mr. Salazar of his rights under *Miranda*, and Mr. Salazar stated that he understood and waived them. He then confessed to having sold approximately ten pounds of methamphetamines over the previous two-year period.

## DISCUSSION

### A.

We review the facts underlying a district court's denial of a motion to suppress in the light most favorable to the government, and the ultimate

determination of reasonableness de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998).

Mr. Salazar does not seriously dispute that the officers had probable cause to believe the Ford Explorer contained drugs. The statement by Ms. Hayes, and the drug detection dog alert, either singly or together, provided probable cause. See Ornelas v. United States, 517 U.S. at 696 ("[P]robable cause to search [exists] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."). See also Illinois v. Gates, 462 U.S. 213, 238 (1983) (holding that probable cause may be gleaned from the hearsay statements of informants); United States v. Blaze, 143 F.3d 585, 592 (10th Cir. 1998) (holding that probable cause exists once drug detection dog alerts on closed container); United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993) (same).

Rather, the core of Mr. Salazar's argument is that the Fourth Amendment required the officers to obtain a warrant before searching the vehicle since the search could not have been incident to a lawful arrest, and there were no exigent circumstances. Br. of Appellant at 19. He develops this reasoning with an argument that the automobile exception to the warrant requirement does not apply because the vehicle was in a motel parking lot, without its driver. He further contends that the officers had full control of the vehicle and could have secured it

"either by guarding it in the parking lot or moving it to a secure location at the Lenexa Police Station" while seeking a warrant.    Id. at 21.

Mr. Salazar cites no case point which so limits the automobile exception established more than seventy-five years ago in     Carroll v. United States   , 267 U.S. 132, 155-56 (1924), and followed broadly since.     See, e.g., Florida v. White   , 526 U.S. 559, 563-64 (1999) ( "[W]hen federal officers have probable cause to believe that an automobile contains contraband, the Fourth Amendment does not require them to obtain a warrant prior to searching the car for and seizing the contraband."). Motel parking lots openly available to public access are no exception to roadside stop cases.     See United States v. Ludwig   , 10 F.3d at 1528 (holding that "[a]lthough the automobile exception is based in part on exigence," where police have probable cause to search a car they need not get a search warrant, even if they have the time and opportunity). Despite defendant's assertions, our holding in     United States v. Edwards   , 242 F.3d 928 (10th Cir. 2001), is not to the contrary, and courts have not focused on factual controversies regarding the degree to which a vehicle is or is not readily mobile, or whether its mobility has been or could be obstructed by the police. That is especially true in circumstances such as those here. The officers testified, and the court specifically found as a fact, that there was reason to believe that the registered owner of the automobile, or some other person, including the person who had called on the

telephone in the motel room, might show up and attempt to move the vehicle in as short a time as five minutes. R. Vol. IV at 137-39, 203-04. The court's factual finding in this regard is not clearly erroneous.

Accordingly, under the totality of the facts in this case, the district court did not err in denying the motion to suppress the drugs discovered in the search of the vehicle.

## B.

We review *de novo* the issue of whether a defendant's statements were obtained in violation of his rights under the Fifth Amendment, while according deference to the district court's findings on factual questions. Davis v. North Carolina, 384 U.S. 737, 741-42 (1966); United States v. Chalan, 812 F.2d 1302, 1307-08 (10th Cir. 1987). The burden is on the government to prove that the defendant waived his Fifth Amendment rights. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Mr. Salazar claims that his confession to federal officers on May 5, 2000, during the ride to Topeka, after being advised of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), violated his rights under the Fifth Amendment. He contends, therefore, that the district court erred in denying the motion to suppress statements that he had sold approximately ten pounds of methamphetamine over

the past two years. In view of the conclusion we have already reached regarding

the lawful seizure of the 144.3 grams of methamphetamine from the vehicle, this

issue is relevant only to sentencing where the larger quantity of drugs was

involved as relevant conduct. [1]

Mr. Salazar's argument rests on the fact that he was silent, except for

cursory casual conversation, after being advised of his rights in the motel room on

May 3, 2000. He contends that this case falls within the doctrine that a defendant

is not subject to interrogation after expressing his intention to assert his Fifth

Amendment right to remain silent, see Br. of Appellant at 24 (citing Edwards v.

Arizona , 451 U.S. 477, 483-85 (1981) (dealing with the invocation and

---

[1]At oral argument, Mr. Salazar's counsel suggested that had Mr. Salazar not pled guilty after the district court failed to suppress these statements, the government would have certainly used these statements at trial to portray him as a drug dealer, and that this evidence would have influenced the jury. He argues, therefore, that the district court's failure to suppress the evidence impacts the guilt phase as well as the sentencing phase.

Even assuming *arguendo* that we accepted Mr. Salazar's contention, we would nevertheless conclude that any error was harmless. A constitutional error is harmless if the government proves, beyond a reasonable doubt, that it did not impact the outcome of the defendant's case. See Chapman v. California, 386 U.S. 18, 24 (1967); United States v. Edwards, 224 F.3d 1216, 1223 (10th Cir. 2000) (quoting Chapman, 386 U.S. at 24). Here, Mr. Salazar's statements to Agents Pettry and Jones regarding the ten pounds of methamphetamine he sold in the preceding two years was merely cumulative to and in addition to the more than 140 grams of methamphetamine found in the automobile at the motel on the day of his arrest. There was more than enough evidence to convict Mr. Salazar on the drug trafficking charges brought against him even without his statements to Agents Pettry and Jones.

subsequent abandonment of the right to counsel); Davis v. United States, 512 U.S. 452, 458 (1994) (same)), and that any reinitiation of questioning by police after such invocation of the right to remain silent "causes any statement to be presumed to be involuntary." Id. (citing McNeil v. Washington, 501 U.S. 171, 177 (1991)).

The parties disagree, however, over the legal conclusion that should be drawn in this case from the fact that Mr. Salazar did not talk about any potential criminal activity after he was advised of his rights in the motel room. Mr. Salazar, citing cases from the Second, Fifth, and Sixth Circuits, contends that his unresponsiveness in the face of the prospect of questions about potential criminal activity constituted an invocation of his Constitutional right to remain silent, see Reply Br. of Appellant at 11-12 (citing United States v. Hernandez, 574 F.2d 1362, 1368 (5th Cir. 1978); United States v. Montana, 958 F.2d 516, 518 (2d Cir. 1992); McGraw v. Holland, 257 F.3d 513, 517 (6th Cir. 2001)), and that law enforcement officers were therefore precluded from questioning him further about the alleged crime.

The government, on the other hand, asserts that Mr. Salazar did not expressly invoke his right to remain silent, and that his silence, under the circumstances, merely created an ambiguity, allowing further questioning so long as there was sufficient attenuation between any original refusal to speak and the subsequent questioning by Agents Pettry and Jones. Br. of Appellee at 16 (citing

Davis v. United States, 512 U.S. at 458). [2]   The government notes that "the Edwards rule serves the prophylactic purpose of preventing officers from badgering a suspect into waiving his previously asserted *Miranda* rights, and its applicability requires courts to determine whether the accused actually invoked his [rights]." Id. (citing Davis, 512 U.S. at 458 (citing Michigan v. Harvey, 494 U.S. 344, 350 (1990))).  The government contends that under Edwards (a case actually involving invocation of the sixth amendment right to counsel), Mr. Salazar did not clearly invoke his right to remain silent and that Agents Pettry and Jones properly resumed questioning. [3]

We need not resolve the parties' disagreement.  Regardless of whether or not Mr. Salazar's statements to Agents Jones and Pettry were obtained in

---

[2]See also Michigan v. Mosley, 423 U.S. 96, 104-05 (1975) (holding that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored,'" and upholding officers' attempts to resume questioning after defendant invoked right to remain silent because defendant was readvised of his rights, sufficient time elapsed between the original invocation and the requestioning, and the questioning involved a different crime).

[3]At trial, the government elicited testimony that the encounter between Mr. Salazar and the officers at the motel was quite brief, and that the officers did not pursue any further attempt to question Mr. Salazar at that time.  The government further notes that the record does not disclose any attempt to question Mr. Salazar between the encounter at the motel and the time he was delivered into custody of the federal agents on the morning of May 5, 2000.  Finally, the government emphasizes that prior to taking Mr. Salazar to Topeka, Agent Pettry asked the Lenexa police officers if Mr. Salazar had been advised of his rights and had invoked them.  According to Agent Pettry, the response led him to believe that Mr. Salazar had not invoked his *Miranda* rights.  R. Vol. IV at 92-93.

violation of Mr. Salazar's Fifth Amendment rights, we have already recognized that Mr. Salazar's statements were considered by the district court solely for the purpose of sentencing. We have previously held that the exclusionary rule does not apply in sentencing proceedings. See United States v. Ryan, 236 F.3d 1268, 1272 (10th Cir. 2001) (holding that the exclusionary rule does not apply at sentencing "unless there is evidence that the officers' actions in violating [the defendant's] rights were done with the intent to secure an increased sentence"). As such, even if we assume that Mr. Salazar's statements to Agents Jones and Pettry were obtained in violation of his Fifth Amendment rights, the district court did not err in considering them at sentencing.

## C.

Mr. Salazar also very briefly argues for a return of the money found on his person and for the return of the $5,000 found in the safe at the residence he shared with Ms. Toll. Based on the record outlined above, we conclude that the district court did not err in refusing to suppress evidence of that money or to return it.

**CONCLUSION**

For the reasons stated above, and based on review of all the arguments made by Mr. Salazar, and the record before us, the conviction and sentencing in this case are AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge