**UNITED STATES of America,
Plaintiffs,**

v.

**Manuel Ojeda GUERRA,
Jr., Defendant.**

**No. 02–20028–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Jan. 7, 2003.

---

into custody and given his *Miranda* warnings, and that he did not voluntarily consent to the search of his home. The Court held an evidentiary hearing on the defendant's motion on October 23, 2002. At the conclusion of the hearing, the government requested the opportunity to present additional testimony. The Court granted the request and continued the hearing to November 12, 2002 at 8:00 a.m. At the continued hearing, the government's witness failed to appear, the parties arrived at a stipulation regarding the missing witness' testimony, and the record was closed. The government requested an opportunity to file a supplemental brief, which has been received, along with the defendant's supplemental submission, and the matter is now ready for decision.

The Court finds that the police in this case failed to scrupulously honor the defendant's right to remain silent, which he properly communicated to officers while in custody, and the statements he gave in the station house must be suppressed. However, under the totality of circumstances, the defendant's consent to search his home was voluntarily given, and the fruits of that search need not be suppressed.

Michael J. Hluchaniuk, U.S. Attorney's Office, Bay City, MI, for United States.

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE**

LAWSON, District Judge.

The defendant, Manuel Ojeda Guerra, Jr., charged in a seven-count indictment with various controlled substance and weapons offenses, has filed a motion to suppress statements and the fruits of a search. He claims that his statements were obtained in violation of his right to silence, which he asserted after he had been taken

I.

The defendant and a co-suspect, Robert Koeppe, were arrested near a restaurant in Bay County, Michigan at approximately 5:30 p.m. on February 11, 2002 following a controlled purchase of marijuana by undercover police officers. The purchase was arranged through a confidential informant who, himself, had been arrested earlier that day and agreed to cooperate. The arrest was conducted by officers of the Thumb Narcotics Unit, a so-called "concept unit" consisting of the joint forces of federal, state and local police agencies tasked to enforce the controlled substance laws.

After the arrest, Koeppe and the defendant were transported separately to the Michigan State Police post in Bay City, arriving there at about 6:00 p.m. The two suspects were separated: Koeppe was taken to a second floor conference room, and the defendant was taken initially to the booking area on the first floor. Michigan State Police Lieutenant Harry Norman was in charge of the investigation. Almost immediately after arriving at the post, he and Michigan State Police Officer Michael Krugielki approached Koeppe and informed him of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Koeppe refused to make a statement. The officers terminated the interview and left the room.

At approximately 6:15 p.m., Krugielki and Norman went to the booking room where they read the defendant his *Miranda* rights. Michigan State Police Lieutenant Melvin Mathews was also present. Mathews had been involved in the defendant's arrest for selling marijuana and had transported him to the state police post. Krugielki testified that the defendant responded to the *Miranda* warnings by saying, "I don't want to say anything." Krugielki terminated the interview and left the defendant siting on a bench in the booking room, handcuffed to a pole. The room was active. Uniformed officers were coming in and out as they were conducting business. The room is adjacent to the report writing area where officers come and go. Krugielki testified that to the best of his knowledge, no other officer contacted the defendant while he sat in the room. He said that the defendant appeared nervous and scared, but was not under the influence of drugs nor did he have trouble responding to or understanding questions.

The police officers then went about their business, preparing the paperwork to obtain search warrants for Koeppe's and the defendant's residences. Krugielki testified that as he was passing through the booking room, the defendant asked him what was going to happen to him, inquired if the police were going to his house, and asked to telephone his wife. Krugielki responded by stating, "You said you didn't want to talk, are you willing to talk now?" The defendant said nothing further, giving Krugielki a blank stare. Krugielki then continued about his business and did not continue to talk with the defendant. He explained that he did not allow the defendant to call his wife because the police were planning to search the defendant's house and he did not want the occupants alerted.

Bay County Deputy Sheriff John Kramer, assigned to the Bay Area Narcotics Enforcement Team (BAYANET), another concept unit participating in the arrest, testified that at approximately 6:35 p.m., Robert Koeppe initiated contact with him and told him that he wanted to speak with Lt. Norman. Norman was informed, and came to the second floor conference room where he had Koeppe fill out a form acknowledging receipt and waiver of his *Miranda* rights. Thereafter Koeppe completed a one-page written statement acknowledging his and the defendant's involvement in the controlled substance offense, followed by a verbal interview that was tape-recorded.

Lt. Mathews, who had left the defendant alone after the defendant had invoked his right to silence, subsequently learned that Koeppe was giving a statement to Lt. Norman. Mathews went to the second floor and obtained a copy of Koeppe's written statement, and then proceeded to the booking room to speak with the defendant. Mathews testified that the reason he returned to the defendant was to obtain an acknowledgment on a *"Miranda* card" that the defendant had been informed of his rights. However, the card itself, Hearing

Exhibit 2, contains no space for an acknowledgment; there is only a signature line for a waiver. In any event, Mathews addressed the defendant on the second occasion at approximately 6:50 p.m., re-read him his *Miranda* warnings, and told him that "Koeppe was talking to the officers and was telling us everything that was going on and that he gave us a written statement."

Mathews testified that he made that declaration because he figured that the defendant might want to talk after learning that Koeppe gave a statement. The defendant responded that he did not believe that Koeppe made a statement, and then Mathews asked the defendant if he wanted to see the written statement. The defendant replied in the affirmative, and Mathews showed the defendant Koeppe's statement. The defendant read the statement and then asked Mathews what he wanted to know.

Mathews acknowledged that he specifically took Koeppe's written statement with him when he "re-*Mirandized*" the defendant in anticipation that he would show the defendant the statement if the defendant requested. Mathews testified that he is trained in interrogation and recognized the technique of playing one suspect against another, since a person may agree to make a statement if he knows that a co-suspect is talking.

The technique had its desired effect, and the defendant responded to Mathews' questions about the defendant's source for drugs by stating that he found the marijuana in a garbage bag behind a Church's Chicken restaurant on Genesee Street. Mathews expressed appropriate incredulity, and asked the defendant if he could search his house. The defendant responded that he would allow the search. A consent form was on the reverse side of the *Miranda* card (Exhibit 2), and the defendant filled it out and signed it.

Mathews terminated the interview and informed the defendant that Lt. Norman would continue speaking with him. Mathews then contacted another officer to tell him that he could discontinue his preparation of a search warrant affidavit for the defendant's house because consent to search had been obtained.

Some time after 7:00 p.m., Lt. Norman interviewed the defendant, who by this time had been moved to the basement stairwell. Officer Krugielki was present for part of the interview. The defendant initially repeated his statement that he had found the marijuana in a garbage bag, but later recanted and informed the officers of his source of supply. He also described the locations at his residence where more drugs and cash could be found. The defendant was asked to arrange a purchase from his supplier—his brother-in-law—but he was unable to make contact. Mathews testified that the defendant was later taken to a Saginaw residence and had a transmitter placed on him so that officers could hear his conversation. The defendant spoke with an Hispanic male, but the male acted as if he did not know what the defendant was talking about, so nothing happened with that event. Mathews told the defendant that the prosecutor's office would be interested to know that the defendant had tried to help out.

The police conducted a search of the defendant's residence pursuant to the consent given, and seized various amounts of controlled substances, firearms and currency. The defendant contends that the government intends to use his statements and the items seized from his house as evidence at trial.

## II.

### A.

◼ The Fifth Amendment guarantees that "no person ... shall be compelled in

any criminal case to be a witness against himself." U.S. Const. amend. V. To achieve this objective, the Supreme Court devised a mandatory procedure, commonly referred to as the *Miranda* warnings, for law enforcement officers to follow before interrogating a suspect in custody. The suspect must be informed prior to any questioning that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 445, 86 S.Ct. 1602. These warnings are constitutionally required in order to combat the "compelling pressures inherent in custodial police interrogation" "and to permit a full opportunity to exercise the privilege against self-incrimination" guaranteed by the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 440, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602). According to *Miranda*, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602. Statements obtained from a suspect in custody who has not been apprised of his rights are inadmissible to prove guilt at trial. *Id.* at 458–59, 86 S.Ct. 1602.

In order to "fully honor[ ]" the right to remain silent and to the assistance of counsel during interrogation, once a suspect invokes those rights, interrogation must cease. *McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir.2001) (quoting *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). The circumstances under which subsequent questioning may occur vary depending on the nature of the right invoked by the suspect. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68

L.Ed.2d 378 (1981), the Supreme Court established a *per se* rule that once a suspect in custody invokes the right to counsel, law enforcement officers may not further interrogate the suspect until counsel has been made available, unless the accused initiates further communication with the police. *Id.* at 484–85, 101 S.Ct. 1880. However, in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), the Court held that if a suspect in custody only invokes his right to remain silent and not the right to counsel, then re-interrogation by the police may be appropriate in certain circumstances. *Id.* at 104, 96 S.Ct. 321.

The defendant in *Mosley* was arrested for robbery. After advising the defendant of his *Miranda* rights, a police officer began to question the defendant about the robbery. The defendant responded by saying that he did not want to answer any questions, whereupon the officer promptly ceased the interrogation. The defendant never indicated a desire to consult with a lawyer. Two hours later another police officer met with the defendant and, after advising the defendant of his *Miranda* rights, began to question the defendant about a fatal shooting which was entirely unrelated to the robbery. The officer told the defendant that another man had named him as the "shooter." The defendant then made a statement implicating himself in the homicide. The defendant moved to suppress his incriminating statement on the grounds that, under *Miranda*, it was constitutionally impermissible for one police officer to question him about a murder after he had told another officer that he did not want to answer any questions about a robbery. The trial court denied the motion and the Michigan Court of Appeals reversed, holding that the second officer's interrogation was a *per se* violation of the *Miranda* doctrine because any subsequent communication between a police officer and a suspect was unconstitu-

tional after the suspect had invoked a right to remain silent.

The United States Supreme Court reversed. The Court endeavored to strike a balance between the idea that "permit[ting] the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda*," and the notion that invoking one's right to silence might irrationally create "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation." *Id.* at 102, 96 S.Ct. 321. The Court concluded that the *Miranda* opinion cannot "sensibly be read to create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." *Id.* at 102–03, 96 S.Ct. 321. However, the Court emphasized that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his *'right to cut off questioning'* was *'scrupulously honored.'* " *Id.* at 104, 96 S.Ct. 321 (emphasis added).

In determining that Mosley's right was "scrupulously honored," the Court pointed out that Mosley was given *Miranda* warnings before the first interrogation, including a careful explanation that "he was under no obligation to answer any questions and could remain silent if he wished." *Ibid.* Next, when Mosley said he did not want to talk about the robberies, questioning ceased and the detective did not try to resume the interrogation or persuade Mosley to change his mind. *Ibid.* Further, more than two hours elapsed before the second police officer began to question Mosley. The second interrogation occurred in a different location and concerned an entirely unrelated crime, and the second officer did not attempt to inquire about matters which Mosley had re-

fused to discuss previously. *Id.* at 104–05, 96 S.Ct. 321. The Court concluded:

> This is not a case, therefore, where the police failed to honor the decision of a person in custody to cut off questioning, either by refusing to discontinue interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation.

*Id.* at 105–06, 96 S.Ct. 321.

The facts in this case portray a set of circumstances that are antonymous to those in *Mosley*. Here, the defendant asserted his right to remain silent at approximately 6:15 p.m. Questioning appropriately ceased. However, about 35 minutes later, Lt. Mathews returned to the same location where the defendant had been left, and resumed questioning about the identical crime. Mathews' stated reason for returning to the booking area—to secure the defendant's signature on the *Miranda* card as an acknowledgment that he had been read his rights—is unpersuasive, given the absence of any language on the form that suggested acknowledgment rather than waiver of rights, and Mathews' admission that he obtained a copy of the co-suspect's written statement before he returned to the defendant in anticipation of confronting him with it. There can be little doubt that Mathews' intended to use Koeppe's statement as a lever to pry an admission from the defendant. Although this certainly is an accepted and lawful interrogation technique under other circumstances, it can hardly be viewed as

"scrupulously honor[ing]" the defendant's right to remain silent.

The government cites *United States v. Hurst*, 228 F.3d 751, 758–60 (6th Cir.2000), for the proposition that advising the defendant that the co-suspect had made a statement does not necessarily constitute an interrogation. In that case, the defendant agreed to speak to the police, but refused to answer questions about firearms. The officer then told the defendant, "we've got good information on you," and thereafter the defendant made an incriminating statement. The court in that case, however, relied heavily on its finding that the defendant never made "a clear and unequivocal assertion of his right to remain silent," and it did not view the officer's statement as containing a compulsive element. *Id.* at 760, 228 F.3d 751. In this case, Lt. Mathews testified that he intended his revelation of Koeppe's statement to elicit a response from the defendant. Mathews' second encounter with the defendant fits within the definition of "interrogation." *See Rhode Island v. Innis* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.").

The defendant in this case properly invoked his right to remain silent. The further questioning that occurred shortly thereafter on the same subject while the defendant was in custody violated the proscriptions of *Miranda* and its progeny, and the resulting statements will be suppressed. *See McGraw*, 257 F.3d at 520 n. 2.

## B.

■ The defendant argues that his consent to search his house is derivative of the *Miranda* violation, and the search must therefore be invalidated as the fruit of the prior illegality. The "fruit of the poisonous tree" doctrine has its origin in Fourth Amendment jurisprudence. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The purpose of this doctrine is to give full effect to the exclusionary rule in order to deter unreasonable searches and seizures. *Dunaway v. New York*, 442 U.S. 200, 216–17, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). However, the Supreme Court has never extended the "fruits" doctrine to violations of *Miranda*, despite opportunities to do so, *see, e.g., Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), since "[t]he exclusionary rule, ... when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth." *Brown v. Illinois*, 422 U.S. 590, 601, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Thus, although a confession which is the fruit of a Fourth Amendment violation must be suppressed, *see Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982), a consent to search obtained following a *Miranda* violation is not automatically tainted. *See Elstad*, 470 U.S. at 307, 105 S.Ct. 1285 ("But the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."). This apparent lack of congruity is explained by "the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment." *Dickerson*, 530 U.S. at 441, 120 S.Ct. 2326.

The Sixth Circuit has held that "where police simply fail to administer *Miranda* warnings, the admissibility of nontestimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the Fifth Amendment." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1515 (6th Cir.1988). To determine whether a statement was voluntary, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" and decide "whether the defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326 (internal quotes and citations omitted). "Relevant factors may include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 422–23 (6th Cir. 1999). Other factors are "(1) the time elapsing between arrest and arraignment of the defendant[;] (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession[;] (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him[;] (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession." 18 U.S.C. § 3501(b); *see United States v. Weekley*, 130 F.3d 747, 751 (6th Cir.1997).

Although courts have recognized the inherent coercive nature of a custodial setting, none of the factors outlined above suggest a conclusion that the defendant's statements in this case were coerced. The defendant was not physically abused, he was informed of his rights, he was not intellectually challenged, and he was not deprived of food or sleep. The statements were made within a relatively short time following the defendant's arrest, the defendant was told that he need not speak and could have the assistance of counsel, and there is no evidence that the statement was induced by a promise of leniency. The defendant's will was not overborne and the statements were not the product of coercion.

Although a finding that the defendant's statements were not coerced satisfies the inquiry under the Fifth Amendment, the ensuing search must also pass muster under the Fourth Amendment as well. "While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search is not unreasonable if a person with a privacy interest in the item to be searched gives free and voluntary consent." *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir.1998); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Kelly*, 913 F.2d 261, 265 (6th Cir.1990). "The government bears the burden of proving through 'clear and positive testimony' that the consent to search was given voluntarily." *Ivy*, 165 F.3d at 402; *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir.1992) ("Consent must be proved by clear and positive testimony and must be unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion."). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412

U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

The "totality of circumstances" test in determining whether consent to search is voluntary mirrors the factors used to evaluate the voluntariness of a statement.

> First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights. *See United States v. Jones,* 846 F.2d 358, 360 (6th Cir.1988). Second, a court should consider the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police, *see Bustamonte,* 412 U.S. at 226, 93 S.Ct. 2041; and indications of "more subtle forms of coercion that might flaw [an individual's] judgment." *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

*Ivy,* 165 F.3d at 402. Of all the factors listed above, the Sixth Circuit has identified as "a key test of the validity of a consent to a search given by a person in custody ... whether the person was informed consent could be refused." *United States v. Haynes,* 301 F.3d 669, 682 (6th Cir.2002) (quoting *United States v. Calhoun,* 49 F.3d 231, 235 n. 4 (6th Cir.1995)).

Exhibit 2 in this case, the consent-to-search ·form signed by the defendant, clearly tells the defendant that he has "the right to refuse to allow me to search your residence." Gov't Ex. 2. The other circumstances surrounding the defendant's consent likewise do not suggest coercion. According to the testimony, the defendant was not induced to allow the search of his house by any promises or threats. Although Detective Mathews expressed disbelief over the defendant's tall tale of finding two pounds of marijuana abandoned in a garbage bag behind a fast food restaurant, the defendant was not treated harshly by the police, nor was he threatened or cajoled in order to be persuaded to consent to the search. The Court is satisfied that the government has carried its burden of showing that the defendant freely and voluntarily consented to the search of his home, and that his consent was not contaminated by duress or coercion.

Because the search of the defendant's home satisfied the requirements of the Fourth Amendment, the defendant's motion to suppress the items seized will be denied.

### III.

The defendant's statements were obtained by the Michigan State Police in violation of the defendant's right to silence. However, the defendant properly consented thereafter to the search of his home.

Accordingly, it is **ORDERED** that the defendant's motion to suppress [dkt # 10] is **GRANTED IN PART AND DENIED IN PART.**

It is further **ORDERED** that the statements made by the defendant to the Michigan State Police Detectives following his arrest and custodial interrogation are **SUPPRESSED** and may not be admitted at trial during the government's case-in-chief.

It is further **ORDERED** that the motion to suppress the items seized from the defendant's home pursuant to his consent to search is **DENIED.**