**Richard MARSACK, Petitioner,**

v.

**Carol HOWES, Respondent.**

**No. 00–10395–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Jan. 14, 2004.

---

Norris J. Thomas, State Appellate Defender Office, Detroit, MI, for Petitioner.

Bethany L. Scheib, Vincent J. Leone, Michigan Department of Attorney General, Lansing, MI, for Respondent.

## OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS

LAWSON, District Judge.

Petitioner Richard Peter Marsack, a state prisoner currently confined at the Lakeland Correctional Facility in Coldwater, Michigan, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petitioner was convicted of first-degree murder following a jury trial conducted in Kalkaska County, Michigan and was sentenced to life imprisonment without the possibility of parole. The petitioner asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence that he committed the murder and because the police obtained his consent to conduct a gun powder residue test and to search his person and home in violation of his right to counsel. The Court disagrees and will deny the petition.

### I.

The petitioner's conviction arises from the shooting death of his work supervisor, Terrence Barr, in Grayling, Michigan on July 13, 1993. The Michigan Court of Appeals summarized the relevant facts as follows:

Both Barr and defendant were employees of the state's Department of Natural Resources (DNR) in the Parks and Recreation Division. Defendant was a water sites operator in the Gaylord DNR office. Barr was the supervisor for the Gaylord and Grayling offices.

On the day of the shooting, Barr left home for work at approximately 6:45 a.m. This was Barr's normal departure time for work in the summer. At approximately 7:00 a.m., Barr's body was found in a ditch off to the side of Wilcox Bridge Road. At a later autopsy, it was determined that Barr had been fatally shot in the chest by a 12–gauge shotgun slug. His truck was parked along the side of the road with a fallen tree obstructing traffic on the road. Witnesses testified that a fallen tree had been lying across the road at approximately 6:15 a.m., at 6:25 a.m., and at 6:50 a.m. There was evidence of wood chips and shavings at the base of the tree stump, indicating that the tree had been intentionally cut down with an ax. Some of these same witnesses observed seeing a green DNR truck in the area before the shooting.

On the day of the shooting, defendant was scheduled to have a meeting with Barr. The day before the shooting, defendant told a fellow employee that he intended to skip work in order to avoid having the meeting with Barr. Defendant, on several occasions, informed other employees that he thought Barr was out to get him fired.

Because defendant was scheduled to meet with Barr on the day of the shooting, the police wanted to talk with defendant. A Crawford County sheriff's deputy and a detective sergeant with the Michigan State Police located defendant at a tire store at 3:10 p.m. on the afternoon of the day of the shooting. *Miranda*[1] warnings were not given at this time. The officers identified themselves and asked defendant about his meeting with Barr that morning. When asked why he did not attend the meeting, defendant simply stated, "I just didn't go." When asked if defendant owned any guns, defendant responded that he did not own guns. Upon further inquiry, defendant stated that he had owned

guns in the past, but that he presently did not own any firearms.

---

[1]*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

The officers then asked defendant if he was willing to answer more questions at the police station since a small crowd had gathered outside the tire store. Defendant agreed and followed the officers in his DNR vehicle. At the station, the officers told defendant that many people had stated that he, in fact, did own several guns. At this point, defendant stated, "I'm no match for you. I want to talk to an attorney." The questioning by the officers then stopped.

At this point, the officers wanted defendant's permission to search his clothing and home and to perform an atomic absorption test to check for gunpowder residue. Defendant was informed of his Miranda rights and was read three consent to search forms. All three consent forms were signed by defendant. At no point was defendant in custody or placed under arrest.

Defendant accompanied the officers to his home in an unmarked police car. Defendant was wearing prison clothing because his personal clothing was being analyzed by the police. Defendant was not placed in handcuffs or otherwise secured within the police vehicle. Defendant was free to move about his home during the search. During the search of the home, the officers observed a gun safe in the basement of the house. The safe was empty; however, there were dust prints on the floor of the safe indicating that guns had been stored in the safe in the past. The officers found .22 caliber shell casings and an ax inside defendant's personal vehicle. Neither the shell casings nor the ax were related to the shooting. No evidence was seized at defendant's home, nor was any evidence found on defendant's clothing. The results of the atomic absorption test were never admitted into evidence at trial. The test was ineffective anyway because defendant had washed his hands before the test.

The ax used to cut down the tree was found near the scene of the shooting. It was later identified by defendant's son as belonging to defendant. The murder weapon was found several months after defendant's arrest in a wooded area, about twenty feet from the road, on the property of defendant's neighbor. It was wrapped in a camouflage case and a box of shells was found with it. Gun registration records established that defendant purchased the shotgun in 1989. On July 15, 1993, defendant purchased a one-way airline ticket to Detroit. Police learned of defendant's intentions after questioning defendant's friend. Defendant had been under surveillance since July 13, 1993. Upon belief that defendant was attempting to flee the area, the Wayne County Sheriff's Office was notified and deputies arrested defendant as a homicide suspect when he landed at Detroit Metropolitan Airport on July 15, 1993.

On July 15, 1993, the police executed a search warrant for defendant's home. Seven guns were found in a deer blind on defendant's property. A shotgun was not recovered; however, an interchangeable barrel was found that fit the murder weapon.

*People v. Marsack,* 231 Mich.App. 364, 366–70, 586 N.W.2d 234, 235–37 (1998).

Following his conviction and sentencing, the petitioner filed a direct appeal in the Michigan Court of Appeals raising several claims of error, including the claims raised in the present petition. The Michigan Court of Appeals affirmed the conviction and sentence. *People v. Marsack,* 231 Mich.App. 364, 586 N.W.2d 234 (1998). The petitioner then filed an application for leave to appeal in the Michigan Supreme Court, which was denied. *People v. Mar-*

*sack*, 460 Mich. 869, 598 N.W.2d 348 (1999). The petitioner also filed a petition for a writ of certiorari in the United States Supreme Court, which was similarly denied. *Marsack v. Michigan*, 528 U.S. 957, 120 S.Ct. 387, 145 L.Ed.2d 302 (1999).

The petitioner, through legal counsel, filed the present petition for a writ of habeas corpus on October 13, 2000 asserting that there was insufficient evidence that he committed the murder, and that the police obtained consent to conduct a gun powder residue test and to search his person and home in violation of his right to counsel. The respondent filed an answer to the petition on March 20, 2001 asserting that the petition should be denied for lack of merit.

## II.

The petitioner's claims are reviewed against the standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (AEDPA). This Act "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus. *See Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2534, 156 L.Ed.2d 471 (2003). The AEDPA applies to all habeas petitions filed after the effective date of the Act, April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 335, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Because the petitioner's application was filed after that date, the provisions of the AEDPA, including the amended standard of review, apply to this case.

As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts may not upset a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 123 S.Ct. at 2535 (quoting *Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); internal quotes omitted). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995) ("We give complete deference to state court findings unless they are clearly erroneous.").

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases....

A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495.

The Supreme Court held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of Section 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409, 120 S.Ct. 1495. The Court defined "unreasonable application" as follows:

[A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .

[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410–11, 120 S.Ct. 1495. *See also McAdoo v. Elo*, 346 F.3d 159, 165–66 (6th Cir.2003); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir.2003) (en banc); *Lewis v. Wilkinson*, 307 F.3d 413, 418 (6th Cir.2002).

## A.

■ The petitioner first asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence that he committed the murder. There is no question that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). However, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is "whether the record evidence *could* reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis added).

[T]his inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318–19, 99 S.Ct. 2781 (internal citation and footnote omitted). This "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n. 16, 99 S.Ct. 2781. Furthermore, unless exceptional circumstances are present, such as evidence of "obvious subterfuge to evade consideration of a federal issue," a state court's construction of its own statute is binding upon this Court. *Mullaney v. Wilbur*, 421 U.S. 684, 691 & n. 11, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)(internal quotation and citation omitted).

The Michigan Court of Appeals ruled on this issue on the petitioner's direct appeal as follows:

An appellate court's review of the sufficiency of the evidence to sustain a conviction turns not on whether there was any evidence to support the conviction, but whether there was sufficient evi-

**490**

dence to justify a rational trier of fact in finding the defendant guilty beyond a reasonable doubt. *People v. Wolfe,* 440 Mich. 508, 513–514, 441 Mich. 1201, 489 N.W.2d 748 (1992). The evidence must be viewed in the light most favorable to the prosecution. *Id.* at 514–515, 489 N.W.2d 748.

. . . . .

In order to convict a defendant of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. Premeditation and deliberation require sufficient time to allow the defendant to take a second look. *People v. Anderson,* 209 Mich.App. 527, 537, 531 N.W.2d 780 (1995). Circumstantial evidence and reasonable inferences drawn from the evidence may constitute satisfactory proof of the elements of the crime. *People v. Greenwood,* 209 Mich.App. 470, 472, 531 N.W.2d 771 (1995). From the above-stated facts, we believe that it is readily conceivable that defendant committed this crime. The prosecution presented evidence of defendant's whereabouts in the early morning hours on July 13 sufficient for a jury to infer and find beyond a reasonable doubt that it was defendant's DNR vehicle that was parked along the side of Lewiston Grade while defendant sat in the wooded area lying in wait for Terrence Barr to pass by on his way to work. Premeditation and deliberation were established by evidence inferring the plan to kill Barr. Defendant chopped down a tree to create a diversion for Barr that required Barr to get out of his truck while defendant waited for Barr in the woods. Essentially, the plan was an ambush to commit murder. The physical evidence linking defendant to the shooting included the fact that the gun used to shoot Barr was registered

to defendant, and the fact that defendant's ax, found at the scene, was the ax used to fell the tree that blocked the victim's right of way.

Further, there was evidence to establish that defendant tried to cover up his involvement in the shooting. Several firearms that defendant owned were hidden in a deer blind on his property. Also, defendant, abruptly and without a neutral reason, took flight to Detroit with the intent to travel to an unknown destination. In sum, after reviewing all the evidence, we believe that there was sufficient evidence presented by the prosecution to justify the trier of fact's conclusion that it was defendant who committed this crime.

*Marsack,* 231 Mich.App. at 370–72, 586 N.W.2d at 237.

■ The state trial court correctly described the requirements of Michigan law. A person commits first-degree murder under Michigan law when intentionally killing another "by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing," Mich. Comp. Laws § 750.316(1)(a), or by perpetrating a murder in the course of certain felonies, such as robbery. Mich. Comp. Laws § 750.316(1)(b). In other words, first-degree premeditated murder, the form of first-degree murder charged in this case, requires a finding that the defendant committed a homicide with premeditation and deliberation. *See People v. Morrin,* 31 Mich.App. 301, 328, 187 N.W.2d 434, 449 (1971). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *Id.* at 329, 187 N.W.2d at 449. Under Michigan law, while the minimum time required to premeditate is "incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a

reasonable man time to subject the nature of his response to a 'second look.'" *People v. Vail*, 393 Mich. 460, 469, 227 N.W.2d 535, 538 (1975), *overruled on other grounds, People v. Graves*, 458 Mich. 476, 581 N.W.2d 229 (1998). "[A]n opportunity for a 'second look' may be merely seconds, minutes, or hours, depending upon the totality of the circumstances surrounding the killing." *Johnson v. Hofbauer*, 159 F.Supp.2d 582, 596 (E.D.Mich.2001) (citing *People v. Berthiaume*, 59 Mich.App. 451, 456, 229 N.W.2d 497 (1975)). "One cannot instantaneously premeditate a murder" in Michigan, and although premeditation and deliberation can be inferred from the circumstances of the homicide, they cannot be the product of speculation. *People v. Plummer*, 229 Mich.App. 293, 301, 305, 581 N.W.2d 753, 757, 759 (1998). On the other hand, "in defining the first degree of murder, the statute specifies two instances in which willfulness, deliberation, and premeditation are most strongly indicated, viz., the use of poison, and *lying in wait*. ..." *People v. Burgess*, 96 Mich.App. 390, 397, 292 N.W.2d 209, 212 (1980) (quoting *People v. Potter*, 5 Mich. 1, 7, (1858)) (emphasis added). Circumstantial evidence and reasonable inferences drawn therefrom may be sufficient to prove the elements of the crime. *See People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177, 180 (1993).

■ Having carefully reviewed the record, this Court finds that the state courts identified the correct legal standard and properly applied it to the facts of the case; the determination is neither contrary to federal law nor an unreasonable application thereof. *See* 28 U.S.C. § 2254(d). The testimony and the physical evidence presented at trial are sufficient to permit a rational jury to find the petitioner's involvement in the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781. Thomas Killoran, the petitioner's friend and co-worker, testified that the petitioner did not get along with Terrence Barr and had discussed killing or injuring him on several occasions prior to the murder. Killoran also testified that the petitioner came to see him around 6:00 p.m. on July 12, 1993, the night before the murder, to complain about Barr. The petitioner told Killoran that he had a chance to shoot Barr that evening, but did not want to do it in front of Barr's wife. Killoran and his wife both testified that the petitioner was driving his own truck when he came to their home.

Several witnesses reported observing a tree blocking Wilcox Bridge Road near the intersection with Lewiston Road between 6:20 a.m. and 6:50 a.m. on July 13, 1993. Those witnesses also testified that a pickup truck was parked nearby on the side of the road facing the wrong way to traffic. At least two of those witnesses identified the vehicle as a DNR truck.

Barr's body was discovered alongside Wilcox Bridge Road by a passerby at approximately 7:00 a.m. Expert testimony established that Barr died from a shotgun wound to the chest. Police recovered from the scene a 12–gauge shotgun shell and an ax with a bolt drilled through its head. Expert testimony established that the ax was used to cut down the tree which had blocked the road. The petitioner's son identified the ax as belong to his father, stating that the petitioner habitually marked his axes in such a manner.

Two DNR employees testified that they saw the petitioner's personal truck in the DNR parking lot by 6:45 a.m. on July 13, 1993 and that his green DNR truck was not in the lot that morning. Witnesses observed the petitioner driving toward Gaylord in his DNR truck around 8:00 a.m., and a service station attendant in Gaylord confirmed that the petitioner made a purchase there at 8:16 a.m.

DNR employee Amy Hough testified that the petitioner arrived at a work site about 30 minutes from Gaylord in his DNR truck at 8:50 a.m. She also stated that the petitioner took his DNR truck to the Upper Lakes Tire store in Gaylord around 10:00 a.m. for the purpose of buying new tires on his truck and having a U-joint repaired. Upper Lakes Tire employees testified that the petitioner asked to have the truck's rear tires replaced, but did not mention a U-joint problem. They also stated that 35% to 50% of the tread was left on the truck's tires at that time.

The petitioner's neighbor, Sheila Schneider, testified that she saw the petitioner driving a green truck at an excessive rate of speed near her home around 7:55 a.m. on July 13, 1993. She saw him drive with his brake lights flickering for about 600 feet and then the lights stopped. Schneider also testified that she found a 12–gauge shotgun, a camouflage casing, and a box of shotgun shells on her property on September 5, 1993. She turned those items over to police.

Expert testimony established that the shotgun found by Schneider was the murder weapon and was registered to the petitioner in 1989. Expert testimony also established that the shotgun shell found at the crime scene and several shells found on property formerly owned by the petitioner were fired from that same gun. Police also recovered a shot barrel for a 12–gauge shotgun from a deer blind on the petitioner's property.

The petitioner's neighbor, Ray Drake, testified that he drove the petitioner to the Traverse City Airport because he expected to be arrested on a murder charge. The petitioner asked Drake to remove guns from the deer blind, sell them, and give the money to the petitioner's family. Police officers testified that they arrested the petitioner at Detroit Metropolitan Airport,

noting that the petitioner had shaved his mustache and was wearing glasses.

From this evidence, a rational trier of fact could find beyond a reasonable doubt that the prosecution had proven that the petitioner was responsible for the premeditated murder of Terrence Barr. There was evidence of a motive, the means to commit the killing, and an opportunity for the petitioner to perpetrate the shooting. The scene depicted an ambush that was orchestrated by means of a fallen tree across the roadway along the victim's regular route to work that required the victim to stop and alight from his vehicle and thus become an easy target. The petitioner was connected to the instrumentality of the ambush—the ax used to fell the tree—and the murder weapon. The claim by the petitioner that the evidence was constitutionally insufficient seeks to challenge the inferences that the jury drew from the testimony presented at trial and the weight they likely accorded certain pieces of evidence. However, it is well-settled that "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle,* 703 F.2d 959, 970 (6th Cir.1983). The Court concludes that on this record, a rational trier of fact could have found beyond a reasonable doubt that the petitioner committed a murder perpetrated by lying in wait so as to support his first-degree murder conviction. The petitioner is not entitled to habeas relief on this claim.

### B.

The petitioner next asserts that he is entitled to habeas relief because the police obtained his consent to conduct a gunpowder residue test and search his person

and home in violation of his constitutional rights including his right to counsel to counsel. Specifically, the petitioner claims that his Fifth and Sixth Amendment rights were violated because the police obtained his consent during a custodial interrogation after he had invoked his right to counsel, and the evidence seized during those searches was admitted at trial. This Court finds that the Petitioner had no right to counsel under the Sixth Amendment under the circumstances presented in this case because no formal proceedings had been commenced at the time the consent to search was solicited; his Fifth Amendment right to counsel was not abridged because no testimonial evidence was obtained or introduced after he invoked his right to an attorney; and the limitation on review of Fourth Amendment claims imposed by the Supreme Court in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), precludes relief on the basis of that Amendment. The state court of appeals correctly disposed of these claims on direct review, and there is no basis upon which to issue a writ on these grounds consistent with the standards set down in 28 U.S.C. § 2254(d).

### 1.

■■■ Taking the Amendments in reverse order, the Sixth Amendment right to counsel does not attach until the initiation of adversary criminal proceedings by a formal charge, a preliminary hearing, an indictment, an information or an arraignment. *See McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "It is only at that time 'that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law.' " *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 81

L.Ed.2d 146 (1984) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). Without the initiation of formal charges, the possibility that a pretrial proceeding may have important consequences at trial, standing alone, is insufficient to trigger the Sixth Amendment right to counsel. *See Moran v. Burbine,* 475 U.S. 412, 431–32, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Once the right to counsel has attached and been asserted by the accused, the Sixth Amendment compels the state to furnish counsel at "critical stage[s]" of the proceedings. *See Michigan v. Jackson,* 475 U.S. 625, 632, n. 5, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). A critical stage of the proceedings includes government efforts to elicit information from the accused concerning the charged crime. *Id.* at 630, 106 S.Ct. 1404. Once the right has attached and been invoked by the accused, any waiver of the right during a subsequent police-initiated custodial interrogation concerning the charged crime is ineffective. *McNeil,* 501 U.S. at 175, 111 S.Ct. 2204.

■■■ The state court of appeals disposed of the Sixth Amendment argument on direct appeal as follows:

Defendant claims that the police investigation focused on him as a suspect when he was questioned so that his Sixth Amendment right to counsel had attached. We disagree.

First, the facts do not show that the police focused the investigation solely on defendant. Defendant was not a suspect until after he appeared for questioning at the police station. The reason defendant was sought for questioning was because he had a scheduled meeting with Barr on the day of the shooting. Second, the Sixth Amendment right to counsel did not attach even if the police had focused their investigation on defendant. The right attaches and represents

a critical stage in the proceedings only after adversarial legal proceedings have been initiated against a defendant by way of indictment, information, formal charge, preliminary hearing, or arraignment. *People v. Anderson* (After Remand), 446 Mich. 392, 402, 521 N.W.2d 538 (1994), cert. den. 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995).

Formal adversarial proceedings had not begun when defendant was asked to sign the consent forms. While Michigan case law does not address whether a consent to search form is a critical stage, we again look to the federal circuit courts for guidance. The Second Circuit Court of Appeals has held that a request for a consent to search is not a critical stage of a criminal proceeding to which the right to counsel applies. *United States v. Kon Yu–Leung*, 910 F.2d 33, 39 (C.A.2, 1990). That court held that the Sixth Amendment right to counsel does not apply to a consent to search, because a search does not generate evidence, but merely reveals evidence already in existence and certain to become available to the government in due course. *Id.* at 40. A request for a consent to search is not a trial-like confrontation; instead, it is more like a request for other types of physical evidence, such as handwriting exemplars and blood samples. *United States v. Hidalgo*, 7 F.3d 1566, 1570 (C.A.11, 1993). We agree. Thus, defendant's Sixth Amendment right to counsel had not yet attached.

When defendant requested counsel, it was predicated on his Fifth Amendment right against self-incrimination only. The police officers' request that defendant provide consent to searches of his person, home, and clothing did not violate defendant's Sixth Amendment right to counsel.

*Marsack*, 231 Mich.App. at 377, 586 N.W.2d at 239–40.

The state court of appeals' decision reproduced above is neither contrary to federal law nor an unreasonable application of that law. The petitioner's Sixth Amendment right to counsel had not yet attached at the time he was questioned by police because adversary criminal proceedings had not yet been initiated. *See McNeil*, 501 U.S. at 175, 111 S.Ct. 2204; *Gouveia*, 467 U.S. at 189, 104 S.Ct. 2292. Although the petitioner may have been suspected of committing the crime, he was not yet charged with its commission. Formal proceedings had not yet been initiated, and there is no evidence that the prosecution delayed bringing formal charges in order to secure the petitioner's consent to search in the absence of counsel. The petitioner is thus not entitled to habeas relief on the grounds that he is in custody in violation of the Sixth Amendment.

2.

The Fifth Amendment guarantees that "no person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To achieve this objective, the Supreme Court devised a mandatory procedure, commonly referred to as the *Miranda* warnings, for law enforcement officers to follow before interrogating a suspect in custody. The suspect must be informed prior to any questioning that he "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These warnings are constitutionally required in order to combat the " 'compelling pressures' inherent in custodial police interrogation ... and to permit a full opportunity to exercise the privilege against self-incrimination" guaranteed by the Fifth Amendment. *Dickerson v. United States*,

530 U.S. 428, 440, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (quoting *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602). According to *Miranda*, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467, 86 S.Ct. 1602. Statements obtained from a suspect in custody who has not been apprised of his rights are inadmissible to prove guilt at trial. *Id.* at 458–59, 86 S.Ct. 1602.

■ In order to "fully honor[ ]" the right to remain silent and to the assistance of counsel during interrogation, once a suspect invokes those rights, interrogation must cease. *McGraw v. Holland*, 257 F.3d 513, 518 (6th Cir.2001) (quoting *Miranda*, 384 U.S. at 473–74, 86 S.Ct. 1602: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court established a *per se* rule that once a suspect in custody invokes the right to counsel, law enforcement officers may not further interrogate the suspect until counsel has been made available, unless the accused initiates further communication with the police. *Id.* at 484–85, 101 S.Ct. 1880. However, the invocation of the right to counsel or right to silence merely requires the cessation of "interrogation;" it does not bar the police from engaging in other forms of investigation or gathering evidence.

The contours of what constitutes "interrogation" were set down by the Supreme Court in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). There, the Court said that "interrogation" consisted of "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably like-

ly to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. This definition does not include the gathering of physical evidence.

■ The petitioner argues that the consent to search in this case was derived from a *Miranda* violation; however, the "fruit of the poisonous tree" doctrine set forth in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), although roundly applied to Fourth Amendment violations, has not been extended to Fifth Amendment breaches. *See United States v. Guerra*, 237 F.Supp.2d 795, 801 (E.D.Mich.2003) (collecting cases). Thus, a consent to search that is obtained in violation of *Miranda*, that is, when it results from conversations initiated by the police after a suspect invokes his right to counsel or right to silence, is not necessarily violative of the Constitution. *See ibid.* (noting that "a consent to search obtained following a *Miranda* violation is not automatically tainted"). The Sixth Circuit has held that "where police simply fail to administer *Miranda* warnings, the admissibility of non-testimonial physical evidence derived from the uncounseled statements should turn on whether the statements were voluntary within the meaning of the fifth amendment." *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1518 (6th Cir.1988). Voluntariness, then is the touchstone for determining the validity of all consents to search, including those obtained after invocation by a suspect of rights that would automatically cut off interrogation. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (noting that "the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted"). Voluntariness must be determined by assessing the totality of

the circumstances. *See Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326 (internal citation omitted) (holding that to determine whether a statement was voluntary, the court must consider the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" and decide " 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession"). The factors used to determine the voluntariness of a statement mirror those used to assess the voluntariness of a consent to search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (holding that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances"); *Guerra*, 237 F.Supp.2d at 803.

▮ In this case, there is no claim that the defendant's statements that he made to the police after he asked for an attorney were in any way involuntary. Nor is there any claim that the consent to search his clothes, his home and his person (to test for gun powder residue) was involuntary or coerced. This Court, therefore, discerns no violation of the Fifth Amendment that arose from the process of obtaining consent to search and gather evidence in this case.

The state court of appeals approached the issue in a slightly different way. That court held:

> The procedural safeguards for the Fifth Amendment adopted in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), require that the police discontinue the questioning of a suspect when a request for counsel is made. The safeguards adopted in *Miranda* apply only where there is a custodial interrogation; further, "interrogation refers to express questioning and to any words

or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." *People v. Anderson*, 209 Mich.App. 527, 532–533, 531 N.W.2d 780 (1995), citing *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). With respect to custody, the critical question is whether the person reasonably believed that he was not free to leave. *People v. McElhaney*, 215 Mich.App. 269, 278, 545 N.W.2d 18 (1996). In deciding if the defendant was in custody, this Court must look to the totality of the circumstances. *People v. Mendez*, 225 Mich. App. 381, 382, 571 N.W.2d 528 (1997). In looking at all the facts of this case, it is clear that defendant was not in custody at the time he asked for counsel and later signed the consent forms. Defendant voluntarily appeared at the police station for questioning, he was free to leave at any time, and he returned home after the searches were conducted. *Mendez*, 225 Mich.App. at 383–384, 571 N.W.2d 528.

The next question involves whether the police violated the defendant's right to counsel by asking him to sign the consent forms under the shadow of his request to consult with an attorney and in the absence of an attorney. While Michigan courts have yet to decide this issue, we take note of several federal appellate courts' analysis of this issue. The United States Supreme Court has held that the Fifth Amendment protects against compelled incriminating "evidence of a testimonial or communicative nature," and not against compelled production of physical evidence. *Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Is consenting to a search evidence of a testimonial or communicative nature? We believe

that it is not. We look to the federal circuit courts for guidance on this issue. Defendant's consent, in and of itself, is not evidence that tends to incriminate him. While the search pursuant to that consent may disclose incriminating evidence, such evidence is real and physical, not testimonial. *Cody v. Solem,* 755 F.2d 1323, 1330 (C.A.8, 1985), citing *United States v. Garcia,* 496 F.2d 670, 675 (C.A.5, 1974). In *United States v. LaGrone,* 43 F.3d 332 (C.A.7, 1994), the defendant claimed that after he asked to speak with an attorney, the police should have ceased "interrogating" him about whether he would sign a consent to search form. That court stated, "In [*United States v. Glenna,* 878 F.2d 967 (C.A.7,1989)], we held that because requesting consent to search is not likely to elicit an incriminating statement, such questioning is not interrogation." (Citations omitted.) *LaGrone,* at 335. Other federal circuits have adopted this principle. *See United States v. Rodriguez–Garcia,* 983 F.2d 1563 (C.A.10, 1993); *United States v. Lewis,* 287 U.S.App. D.C. 306, 921 F.2d 1294 (1990); *Smith v. Wainwright,* 581 F.2d 1149 (C.A.5, 1978); *United States v. Lemon,* 550 F.2d 467 (C.A.9, 1977); *United States v. Faruolo,* 506 F.2d 490 (C.A.2, 1974). The Wisconsin Supreme Court has compared the protections of the Fifth Amendment, *Miranda,* and the Fourth Amendment. In *State v. Turner,* 136 Wis.2d 333, 401 N.W.2d 827 (1987), the court explained that *Miranda* addresses the need to protect the integrity and fairness of the trial process. In contrast, the Fourth Amendment is concerned with an individual's right to privacy and to be left alone. The court concluded that the Fifth Amendment did not apply to a request for consent to search after a request for counsel was made and that the only issue was whether the consent was voluntarily provided under the Fourth Amendment's tests. *Id.* at 353, 401 N.W.2d 827. We hold that defendant's Fifth Amendment rights were not violated by the police request that he sign consent to search forms after defendant asked for an attorney.

*Marsack,* 231 Mich.App. at 374–76, 586 N.W.2d 234.

This decision was not contrary to or an unreasonable application of federal law as established by the Supreme Court. There was no violation of the defendant's Fifth Amendment rights.

3.

The state court of appeals also considered the defendant's claim arising from the consent to search under the Fourth Amendment. The court stated:

> While warrants are generally required before the police may conduct searches, Fourth Amendment rights are waivable and a defendant may always consent to a search of himself or his premises.... The consent exception to the warrant requirement allows a search and seizure when consent is unequivocal, specific, and freely and intelligently given. *People v. Kaigler,* 368 Mich. 281, 294, 118 N.W.2d 406 (1962); *People v. Malone,* 180 Mich.App. 347, 355, 447 N.W.2d 157 (1989); see generally *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The validity of the consent depends on the totality of the circumstances. *Goforth, supra* at 309.

From the evidence admitted in the lower court's record, it is apparent that the trial court did not err in its findings. The situation and circumstances surrounding defendant's questioning by the officers does not suggest that defendant was coerced into agreeing to the searches. Defendant fully cooperated with the police and never indicated any

reluctance or that he was pressed into cooperating or consenting to the searches. The trial court did not err in finding that the defendant voluntarily consented to the searches.

*Marsack*, 231 Mich.App. at 378–79, 586 N.W.2d 234.

■ As mentioned earlier, this Court is limited to reviewing Fourth Amendment claims on habeas where the petitioner had a full and fair opportunity to litigate the claim in state court, and the presentation of the claim was not thwarted by any failure of the state's corrective processes. *Stone*, 428 U.S. at 494–95, 96 S.Ct. 3037. To determine whether to proceed with a review of a Fourth Amendment claim, the habeas court must conduct a threshold inquiry in two parts. "First, the 'court must determine whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim. Second, the court must determine whether presentation of the claim was in fact frustrated because of a failure of that mechanism.'" *Machacek v. Hofbauer*, 213 F.3d 947, 952 (6th Cir.2000) (quoting *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir.1982)).

■ This Court has little trouble concluding that the petitioner had ample opportunity to litigate his Fourth Amendment claim in the Michigan state courts. The procedural process was available to the petitioner, and he fully utilized the state appellate process through able counsel who thoroughly explored the dimensions of the constitutional rights to which the petitioner was entitled. This Court may not deal further with the Fourth Amendment issue. *Cf. Tukes v. Dugger*, 911 F.2d 508, 512–13 (11th Cir.1990) (finding that *Stone v. Powell* barred the petitioner's claim that his consent to search was invalid because he had invoked his right to counsel).

### III.

For the reasons stated, the decision of the Michigan Court of Appeals rejecting the petitioner's claims of error was neither contrary to, nor an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d).

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus [dkt # 1] is **DENIED**.